[62 NYS3d 1]

UNIVERSAL INVESTMENT ADVISORY SA et al., Appellants-Respondents, v BAKRIE TELECOM PTE., LTD., et al., Respondents-Appellants, and PT BAKRIE & BROTHERS TBK et al., Respondents.

First Department, August 29, 2017

### APPEARANCES OF COUNSEL

*Greenberg Traurig, LLP*, New York City (*James W. Perkins* and *Anne C. Reddy* of counsel), and *Hal Hirsch*, New York City, for appellants-respondents.

*Schnader Harrison Segal & Lewis LLP*, New York City (*Theodore L. Hecht, Kenneth R. Puhala* and *Jessica M. Lau* of counsel), for respondents-appellants and respondents.

### OPINION OF THE COURT

KAPNICK, J.

This case arises out of an issuer's and guarantors' default in the payment of notes that were publicly offered in the international financial markets. Defendant PT Bakrie Telecom Tbk (BTEL) is a telecommunications company organized under the laws of Indonesia and is the parent of defendant Bakrie Telecom Pte., Ltd. (issuer). Defendants PT Bakrie Network (PT Network) and PT Bakrie Connectivity (PT Connectivity) are Indonesian subsidiaries of BTEL (BTEL, issuer, PT Network and PT Connectivity, collectively, the manager defendants). Defendant PT Bakrie & Brothers Tbk (B&B) is the Indonesian parent company of BTEL and the other Bakrie defendants, has effective control over the management of BTEL, and is the controlling shareholder of BTEL, owning 39.6% of BTEL stock at the time of the offering. The individually named defendants

are/were directors or commissioners of BTEL either at the time of the offering or thereafter (individual defendants).

Under an indenture dated May 7, 2010, as supplemented by a supplemental indenture dated January 27, 2011, the issuer, on behalf of BTEL, issued $380 million of guaranteed senior notes, due on May 7, 2015 (notes). Plaintiffs are holders of more than 25% of the notes. By way of an intercompany loan from the issuer, BTEL received the $380 million proceeds of the offering, and issued an unconditional parent guarantee of the issuer's payment obligations under the notes. BTEL's subsidiaries, PT Network and PT Connectivity, executed subsidiary guarantees of the issuer's payment obligations under the notes. Neither B&B nor the individual defendants, in their individual capacities, executed the indenture or the subsequent supplemental indenture or provided any guarantee of the issuer's payment obligations under the notes.

Under the terms of the notes and the indenture, the issuer was obligated to make semiannual interest payments of approximately $21.8 million by funding a New York interest reserve account maintained by the indenture trustee, BNY Mellon. Sections 12.07 (a) through (b) of the indenture contain a New York choice of law and forum selection clause. Section 6.07 of the indenture, referred to by the parties as the "no impairment" clause, provides as follows:

> "*Rights of the holders to Receive Payment.* Notwithstanding anything to the contrary, the right of any holder of a Note to receive payment of the principal of, premium, if any, or interest on, such Note, or to bring suit for the enforcement of any such payment, on or after the due date expressed in the Notes of such series, which right shall not be impaired or affected without the consent of the holder."

Defendants distributed an offering memorandum for the notes, dated April 30, 2010, which incorporated BTEL's 2009 audited financial statements. Defendants distributed a supplemental offering memorandum, dated January 24, 2011. Plaintiffs allege that the offering memoranda falsely portrayed BTEL as a successful wireless provider that continued to experience growth and remained competitive in an ever expanding and developing industry, when in actuality, at the time the offering memoranda were distributed, BTEL was insolvent, its technology was outdated, and the offering memoranda had inflated the value of its assets. Plaintiffs further allege that B&B

and BTEL's directors and commissioners at the time of the offering (offering defendants), by virtue of their positions of decision-making control and management responsibility, were aware that BTEL was incapable of meeting its obligations, or refinancing the $380 million intercompany loan, when the notes matured.

Specifically, plaintiffs allege that BTEL's capital expenditures from 2004 to 2011 were more than 100% of its operating cash flow, such that BTEL had to obtain high interest loans in order to build and maintain the telephone network that is the core of its business; that BTEL's returns continually declined between 2006 and 2013, causing it to lose its competitive market position; and that BTEL improperly depreciated its telephone network assets, claiming a longer useful life than they actually had. Plaintiffs further allege that BTEL's working capital substantially declined since 2008, because its current debt payments were increasing at a greater rate than the cash it generated from operations and financing.

Under the indenture and supplemental indenture, interest on the notes was payable on May 7 and November 7 of each year. In November 2012, BTEL missed its biannual interest payment. Plaintiffs allege that BTEL's directors at the time caused BTEL to issue false assurances to plaintiffs that BTEL had plans to improve its cash flow, which would allow it to pay off the November 2012 interest payment and the upcoming May 2013 interest payment. Plaintiffs contend that the plan to improve cash flow consisted of a short-term infusion from the Bakrie family to make the payments, which further deceived plaintiffs as to BTEL's financial health and status.

In November 2013, and then again in May 2014, BTEL defaulted on its interest payments on the notes. On the eve of the May 2014 payment date, BTEL issued a notice to bondholders that the company was engaged in negotiations concerning its operations and potential restructuring of the notes, and that pending these negotiations, BTEL would not be making any further interest payments on the notes. Plaintiffs were not part of these negotiations.

In response to this notice, plaintiffs and other noteholders, holding an aggregate of $106 million of the notes, formed an ad hoc committee in order to engage in discussions with BTEL about its financial and operational plans, including its plans to restructure the notes. The ad hoc committee entered into a memorandum of understanding (MOU) with BTEL that they

would "enter into a process to reach a resolution to the default," and that for a two-week period, the ad hoc committee would not accelerate or enforce the debt. BTEL allegedly refused to grant the ad hoc committee access to technical, financial and economic data that it required to assess BTEL's restructuring plan. In early August 2014, when the two-week MOU period expired, the MOU was not extended by the parties.

In light of BTEL's failure to make interest payments in November 2013, May 2014 and November 2014, plaintiffs, as holders of at least 25% of the outstanding notes, accelerated the principal and interest due under the notes, by notice of acceleration dated September 29, 2014. On November 9, 2014, BNY Mellon, as indenture trustee, issued a separate notice of acceleration. Plaintiffs commenced this action on or about September 22, 2014.

In addition to the allegations already noted, plaintiffs further allege that, in contravention of section 6.07 of the indenture and New York law, defendants attempted to undermine this litigation by "artificially stag[ing]" a restructuring proceeding in Indonesia (referred to in the complaint as the PKPU), which involved the restructuring of BTEL's obligations under the notes. Specifically, one of BTEL's creditors, allegedly acting in concert with BTEL, commenced the PKPU against BTEL. While the PKPU was purportedly a contested proceeding, BTEL consented to it. On November 10, 2014, the Commercial Court of Central Jakarta appointed a supervisory judge and administrators who announced a process of less than 30 days for the filing and validation of claims, and for voting on a restructuring plan to be submitted by BTEL.

BTEL submitted a restructuring plan in the PKPU proceeding. The plan did not provide for revisions or the submission of a counterplan. Under the terms of the restructuring plan, the noteholders would lose all past due interest under the notes, would have 70% of the principal converted to BTEL stock with a 10-year holding period after approval of the plan, and would not receive interest going forward. The plan further proposed treating the noteholders as unsecured creditors. BTEL later submitted a new plan but refused to provide its creditors with a copy of it. On December 5, 2014, the administrators in the PKPU proceeding determined which claims would be accepted—and, thus, entitled to vote on the plan—or disallowed. On December 8, 2014, the accepted creditors voted on the plan;

plaintiffs were unable to vote, as their claims had been disallowed.

In their second amended verified complaint,[1] plaintiffs asserted nine causes of action for: (1) breach of the notes, indenture and guarantees based on non-payment (asserted against BTEL, the issuer and the guarantors); (2) fraud against BTEL and the issuer for misrepresentations made during the offering; (3) aiding and abetting fraud against the offering defendants and B&B, based on misrepresentations made during the offering; (4) fraud against BTEL for misrepresentations made post-offering; (5) aiding and abetting fraud against the interim defendants (directors and commissioners joining BTEL after the offering), and B&B for misrepresentations made post-offering; (6) breach of fiduciary duty against all defendants;[2] (7) aiding and abetting breach of fiduciary duty against the individual defendants and B&B; (8) breach of contract against BTEL based on breach of sections 6.07 and 12.07 of the indenture; and (9) a declaratory judgment that the PKPU proceeding and plan have no effect on plaintiffs' rights, or on the obligations of BTEL, the issuer or the guarantors under the notes and indenture, and that defendants are liable for plaintiffs' damages incurred in connection with the PKPU proceeding.

The manager defendants moved to dismiss the first cause of action insofar as asserted by plaintiffs Universal Investment Advisory SA (Universal Investment) and Vaquero Master EM Credit Fund Ltd. (Vaquero), and the second through ninth causes of action pursuant to CPLR 3211 (a) (1), (3) and (7) and 3016 (b). B&B and the individual defendants separately moved pursuant to CPLR 3211 (a) (1), (3), (7) and (8) to dismiss the complaint. Plaintiffs cross-moved pursuant to CPLR 3211 (c) to convert the manager defendants' motion to dismiss the first cause of action into a motion for summary judgment, and for summary judgment as to liability on that cause of action.

The motion court granted that portion of the motion by the individual defendants and B&B to dismiss the third, fifth and

---

**1.** The fraud-based claims initially were asserted in a separate action (*Universal Inv. Advisory SA v PT Bakrie Telecom Tbk*, Sup Ct, NY County, Scarpulla, J., index No. 653745/2014), and were later consolidated with the remaining claims in the second amended complaint in this action.

**2.** The motion court dismissed plaintiffs' sixth cause of action for breach of fiduciary duty, finding the claim insufficient as a matter of law. As neither party is appealing this portion of the decision, it will not be addressed by this Court.

seventh causes of action on the ground of lack of personal jurisdiction, and thereby dismissed the complaint in its entirety as asserted against them. The court denied the motion as to the second and fourth causes of action for fraud during the pre- and post-offering periods, and denied the motion of the manager defendants to dismiss the first cause of action for breach of contract asserted by plaintiffs Universal Investment and Vaquero, finding that those plaintiffs had standing to bring that claim.

The court also granted plaintiffs' cross motion for summary judgment on liability under the notes, indentures and guarantees, and directed that the issue of damages be resolved at trial or upon other resolution of the rest of the action. The court, however, dismissed the eighth cause of action for additional breaches of contract as duplicative and unnecessary.

As relevant here, the motion court properly determined that it had jurisdiction over the manager defendants, given that they are all signatories to the indenture, which contains the New York forum selection clause. However, the court found that personal jurisdiction as to B&B and the individual defendants was lacking because they were not signatories to the indenture.[3] Moreover, the court found that under the closely related theory, plaintiffs had failed to allege the extensive involvement of any of those defendants with the indenture transaction, which would evidence a close enough relationship between the signatories and nonsignatories of the indenture as well as involvement in the subject transaction, such that it would be foreseeable that the nonsignatories would be subject to the forum selection clause.

We now reverse as to B&B and the individual defendants and find that the motion to dismiss the third, fifth and seventh causes of action should have been denied without prejudice and the parties permitted to conduct jurisdictional discovery because plaintiffs "have demonstrated that facts 'may exist' in opposition to the motion to dismiss and are therefore entitled to the disclosure expressly sanctioned by CPLR 3211" (*Peterson*

**3.** The motion court did not discuss the merits of the aiding and abetting claims (third, fifth and seventh causes of action) or the sufficiency of plaintiffs' allegations, since it dismissed those claims based on lack of personal jurisdiction. Because we are solely determining that jurisdictional discovery should have been permitted and are thus denying the motion to dismiss these three causes of action without prejudice, we will not consider the substantive allegations of these claims.

*v Spartan Indus.*, 33 NY2d 463, 467 [1974]). "Under New York law, a signatory to a contract may invoke a forum selection clause against a non-signatory if the non-signatory is 'closely related' to one of the signatories such that 'enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound' " (*Metro-Goldwyn-Mayer Studios Inc. v Canal & Distributions S.A.S*, 2010 WL 537583, *5, 2010 US Dist LEXIS 12765, *15 [SD NY, Feb. 9, 2010, No. 07 Civ. 2918 (DAB)], quoting *Direct Mail Prod. Servs. Ltd. v MBNA Corp.*, 2000 WL 1277597, *3, 2000 US Dist LEXIS 12945, *8 [SD NY, Sept. 7, 2000, No. 99 Civ. 10550 (SHS)]; *see also Tate & Lyle Ingredients Ams., Inc. v Whitefox Tech. USA, Inc.*, 98 AD3d 401 [1st Dept 2012]). If the nonsignatory party has an ownership interest or a direct or indirect controlling interest in the signing party (*Metro-Goldwyn-Mayer Studios Inc.*, 2010 WL 537583, *5, 2010 US Dist LEXIS 12765, *15), or, the entities or individuals consulted with each other regarding decisions and were intimately involved in the decision-making process (*Tate & Lyle Ingredients Ams., Inc.*, 98 AD3d at 402), then, a finding of personal jurisdiction based on a forum selection clause may be proper, as it achieves the "rationale behind binding closely related entities to the forum selection clause [which] is to 'promote stable and dependable trade relations' " (*id.*, quoting *Weygandt v Weco, LLC*, 2009 WL 1351808, *5, 2009 Del Ch LEXIS 87, *19 [May 14, 2009, C.A. No. 4056-VCS]).

Here, plaintiffs allege that the individual defendants, by virtue of their senior management positions, power and decision-making authority, and B&B, as the parent company of BTEL and as a principal shareholder of 39.6% of BTEL's stock, had actual knowledge at the time of the offering that BTEL was insolvent and would be incapable of meeting its obligations under the notes; that they authorized, participated in, and promoted the offering; and that they caused the offering memoranda to be distributed into the marketplace.[4] This is enough, at this stage, to permit jurisdictional discovery as to the nature of B&B's and the individual defendants' actual knowledge and role in the offering of the notes, and their responsibilities connected thereto, because this information, which may result in a determination that the nonsignatories

---

4. Plaintiffs further point out that the individual defendants did not refute in their affidavits submitted in support of the motion to dismiss that they had knowledge of, or directed, the offering.

are indeed "closely related" to the signing parties, is a fact that cannot be presently known to plaintiffs, but rather, is within the exclusive control of defendants (*see Peterson*, 33 NY2d at 466).

Although the motion court did not explicitly address defendants' champerty argument, it implicitly rejected it when it properly denied the manager defendants' motion to dismiss, on standing grounds, the breach of contract claim asserted by plaintiffs Universal Investment and Vaquero.

"Judiciary Law § 489 is New York's champerty statute. Section 489 (1) restricts individuals and companies from purchasing or taking an assignment of notes or other securities 'with the intent and for the purpose of bringing an action or proceeding thereon' " (*Justinian Capital SPC v WestLB AG, N.Y. Branch*, 28 NY3d 160, 166 [2016]). Indeed, "[t]o constitute the offense [of champerty] the *primary purpose* of the purchase must be to enable [one] to bring a suit, and the intent to bring a suit must not be merely incidental and contingent" (*id.*, quoting *Moses v McDivitt*, 88 NY 62, 65 [1882]). Under the primary purpose analysis, there is a distinction "between acquiring a thing in action in order to obtain costs and acquiring it in order to protect an independent right of the assignee" (*id.* at 167, quoting *Trust for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 v Love Funding Corp.*, 13 NY3d 190, 198-199 [2009]), with only the former being champertous. However, and as set out in *Trust for Certificate Holders of Merrill Lynch Mtge. Invs., Inc.* (13 NY3d at 195), the offense of champerty does not arise if a corporation or association takes an assignment for the purpose of collecting damages, by means of a lawsuit, "for losses on a debt instrument in which it holds a preexisting proprietary interest." This is because there is a difference "between one who acquires a right in order to make money from litigating it and one who acquires a right in order to enforce it" (*id.* at 200).

■ Here, the assignments to Universal Investment and Vaquero were not champertous. Universal Investment and Vaquero each held a "preexisting proprietary interest" in the notes (*see Trust for Certificate Holders of Merrill Lynch Mtge. Invs.*, 13 NY3d at 195). Pursuant to a written assignment dated September 2014, assignor/nonparty Tembo Sondirya Padone transferred to plaintiff Universal Investment (the chairman of the ad hoc committee and holder of about $4 million of its own notes, through an affiliate) his legal title only to approximately

$87 million of notes. Padone retained full beneficial title to the proceeds of his notes. Pursuant to a written assignment dated September 2014, assignor/nonparty James Bonfils transferred to plaintiff Vaquero (who holds about $9.25 million of his own notes) legal title only to approximately $100,000 of his notes. Bonfils also retained full beneficial title to the proceeds of his notes. Pursuant to both assignments, Universal Investment and Vaquero are entitled to seek reimbursement of fees and expenses incurred in enforcing the assigned notes. Moreover, there are no allegations or evidence that Universal Investment or Vaquero ever paid a purchase price in exchange for the assignments of legal title. Indeed, all that they are entitled to seek is reimbursement for the assignors' pro rata share of costs and fees associated with bringing this lawsuit; neither plaintiff is entitled to retain the assignors' pro rata share of damages, should plaintiffs prevail.

As to plaintiffs' allegations of fraudulent conduct both pre-offering and post-offering, the motion court denied defendants' motion to dismiss, finding that plaintiffs' second and fourth causes of action were not duplicative of the breach of contract claim and that plaintiffs had sufficiently pleaded definite, measurable and out-of-pocket damages in the form of the loss of the value of the notes and the interest due thereunder. The second cause of action was properly sustained. However, the fourth cause of action, which alleges fraud based on defendants' false post-offering assurances that they would make interest payments under the notes, is duplicative of the first cause of action, which alleges breach of contract in connection with nonpayment under the notes (*Mañas v VMS Assoc., LLC*, 53 AD3d 451, 454 [1st Dept 2008]), and thus, should have been dismissed.

As to plaintiffs' eighth cause of action for breach of contract based on the "no impairment" clause and forum selection clause of the indenture, the court granted defendants' motion to dismiss, finding that the claim was duplicative of the first cause of action for breach of contract for failure to make payment under the notes, indenture and guarantees. However, plaintiffs' claim for breach of the "no impairment" clause is not based on defendants' failure to make payment under the notes. Rather, the allegations that BTEL improperly staged the Indonesian restructuring proceeding to interfere with and undermine plaintiffs' rights under the indenture state a cause of action for breach of the "no impairment" clause (§ 6.07) of the indenture.

Indeed, the type of damages available in connection with an alleged breach of the "no impairment" clause may include the costs and fees and other expenses incurred in connection with the PKPU proceeding.

Defendants argue in their brief that plaintiffs' ninth cause of action for a declaratory judgment was properly dismissed. In fact, the motion court did not dismiss that cause of action, but rather "decline[d] to issue a declaratory judgment at [that] time," and did so without prejudice, finding that it could not, at that juncture and based on the allegations contained in the complaint, "determine whether there [was] a justiciable controversy for which declaratory relief would be available." Although plaintiffs argue the merits of this claim on appeal, the motion court did not dismiss this cause of action, and plaintiffs did not affirmatively seek declaratory relief in Supreme Court. Therefore, there is no appealable determination for us to consider.

Lastly, the motion court properly granted plaintiffs' cross motion for summary judgment as to liability on their first cause of action for breach of contract based on defendants' default under the notes, indenture and guarantees. Plaintiffs provided documentation of the unpaid notes, as well as the notice of acceleration provided to defendants, dated September 29, 2014, informing them that they were in default and demanding the principal, premium if any, and interest due. Since we have rejected defendants' arguments as to champerty, and since defendants did not dispute the allegations of non-payment, they fail to raise an issue of fact in this regard.

We have considered the parties' remaining arguments for affirmative relief and find them unavailing.

Accordingly, judgment of the Supreme Court, New York County (Saliann Scarpulla, J.), entered September 29, 2016, dismissing the complaint (third, fifth and seventh causes of action) as against the individual defendants and defendant PT Bakrie & Brothers Tbk for lack of personal jurisdiction, should be reversed, on the law, without costs, the motion to dismiss as to said defendants denied without prejudice, and the court directed to permit the parties to conduct jurisdictional discovery. The orders of the Supreme Court, New York County (Saliann Scarpulla, J.), entered April 22, 2016, which, to the extent appealed from as limited by the briefs, granted plaintiffs' cross motion to convert defendants' motion to dismiss the first cause of action (breach of contract) into a motion for summary

judgment and granted plaintiffs' partial summary judgment on that cause of action, denied defendants' motion to dismiss the claims asserted by plaintiffs Universal Investment Advisory SA and Vaquero Master EM Credit Fund Ltd. for lack of standing, and to dismiss the second and fourth causes of action (fraud), purportedly denied defendants' motion to dismiss the cause of action for a declaratory judgment, and granted defendants' motion to dismiss the eighth cause of action (breach of contract), should be modified, on the law and the facts, to grant defendants' motion to dismiss the fourth cause of action (fraud) as duplicative of the first cause of action (breach of contract), and to deny the motion to dismiss the eighth cause of action (breach of contract), insofar as it asserts a breach of section 6.07 of the indenture, and otherwise affirmed, without costs.

TOM, J.P., MOSKOWITZ and GISCHE, JJ., concur.

Judgment, Supreme Court, New York County, entered September 29, 2016, reversed, on the law, without costs, the motion to dismiss as to said defendants denied without prejudice, and the court is directed to permit the parties to conduct jurisdictional discovery. Orders, Supreme Court, New York County, entered April 22, 2016, modified, on the law and the facts, to grant defendants' motion to dismiss the fourth cause of action (fraud) as duplicative of the first cause of action (breach of contract), and to deny the motion to dismiss the eighth cause of action (breach of contract), insofar as it asserts a breach of section 6.07 of the indenture, and otherwise affirmed, without costs.