Highland Crusader Offshore Partners, L.P. v Targeted Delivery Tech. Holdings, Ltd. (2020 NY Slip Op 02991)





Highland Crusader Offshore Partners, L.P. v Targeted Delivery Tech. Holdings, Ltd.


2020 NY Slip Op 02991


Decided on May 21, 2020


Appellate Division, First Department


Manzanet-Daniels, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on May 21, 2020
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta, P.J.
Dianne T. Renwick
Sallie Manzanet-Daniels
Barbara R. Kapnick
Lizbeth González, JJ.


653486/16 10600 

[*1]Highland Crusader Offshore Partners, L.P., et al., Plaintiffs-Respondents-Appellants,
v
Targeted Delivery Technologies Holdings, Ltd., et al., Defendants-Appellants, Xenova Group, Ltd., et al., Defendants, Celtic Pharma Development Services Bermuda, Ltd., Defendant-Respondent.



Appeals and cross appeal from the order, Supreme Court, New York County (Eileen Bransten, J.), entered December 4, 2018, which, insofar as appealed from as limited by the briefs, granted defendant Celtic Pharma Development Services Bermuda Ltd.'s motion to dismiss the complaint as against it for lack of personal jurisdiction, denied the motions of defendants Targeted Delivery Technologies Holdings, Ltd. (TDTH), Celtic Pharma FIX, Ltd., Celtic Pharma FIX Venture, Ltd., Celtic Pharma Management Company, Ltd., Celtic Therapeutics Management LLLP doing business as Auven Therapeutics Management LLLP and as successor in interest to Celtic Pharma Management, L.P. (Auven), and John Mayo to dismiss the complaint as against them for lack of personal jurisdiction, and denied the motions of TDTH, Celtic Pharma Management Company Ltd., and Auven to dismiss claims arising [*2]out of the servicing agreement for lack of standing.




Wiggin and Dana LLP, New Haven, CT (Jonathan M. Freiman of the Bar of the State of Connecticut and State of Pennsylvania, admitted pro hac vice of counsel) and Wiggin and Dana LLP, New York (Steven B. Malech and Michael L. Kenny, Jr.) for Targeted Delivery Technologies Holdings, Ltd., Targeted Delivery Technologies, Ltd., Celtic Pharma Management Company, Ltd., Celtic Pharma Fix, Ltd., Celtic Pharma Fix Venture, Ltd. and John Mayo, appellants and Celtic Pharma Development Services Bermuda, Ltd., respondent.
Milbank LLP, New York (Scott A. Edelman, Alison Bonelli and Will B. Denker of counsel), for Auven Therapeutics Management LLLP, appellant.
Stinson LLP, New York (Kieran M. Corcoran of counsel), for Highland Crusader Offshore Partners, L.P., respondent-appellant.
Reid Collins & Tsai LLP, Austin, TX (Craig A. Boneau of the bar of the State of Texas, admitted pro hac vice of counsel) and Reid Collins & Tsai LLP, New York (William T. Reid, IV and Ryan M. Goldstein of counsel), for Highland Credit Opportunities CDO, Ltd., Highland Credit Strategies Master Fund, L.P., Highlander Restoration Capital Partners Master, L.P., and NexPoint Credit Strategies Fund, respondents-appellants.



MANZANET-DANIELS, J.


On this appeal, we are asked to consider, among other issues, whether jurisdiction may be exercised over defendants by virtue of their close relationship with signatories to the contracts that contain forum selection clauses, notwithstanding that defendants lack minimum contacts with the forum. We find that plaintiffs have sufficiently pleaded allegations of a close relationship between the signatory and non-signatory parties so as to warrant jurisdictional discovery (see Universal Inv. Advisory SA v Bakrie Telecom Pte., Ltd., 154 AD3d 171, 178-179 [1st Dept 2017].
Background
Plaintiffs are the majority holders of $156 million in secured notes issued by nonparty Celtic Pharma Phinco, B.V. that were due on June 15, 2012. The issuer was a wholly-owned subsidiary of Celtic Pharmaceuticals Holdings, L.P., a private equity fund (Fund).
The notes were guaranteed by various subsidiaries of Fund and the issuer, including, insofar as alleged here, Celtic Pharma FIX Ltd. and Celtic Pharma FIX Venture Ltd. (together, the FIX entities), Targeted Delivery Technologies Holdings (TDTH), and Targeted Delivery Technologies (TDT).
Celtic Pharma Management, L.P. (CPM) was the private equity fund appointed to service the notes. Celtic Pharma Management Company, Ltd. (Manager) was CPM's general partner. (Defendant CPM has not appealed from the order denying its motion to dismiss. CPM "is now dissolved," according to defendant Stephen Evans-Freke.)
Auven is the alleged successor in interest to CPM; Celtic Pharma Management Development Services Bermuda Ltd. (Vendor) is an alleged guarantor of the notes; and Evans-[*3]Freke and John Mayo [FN1] are alleged to have been personally involved in and to have controlled the structuring of the notes offering.
Plaintiffs allege that defendants orchestrated an "international shell game," known as a "bleed-out," in order to defraud plaintiff noteholders. Plaintiffs allege that the scheme involved self-dealing transactions, parallel businesses, and intercompany transfers that had as their goal the depletion of the assets of the companies within the collateral pool that secured the notes, and the funneling of those assets to related companies outside the collateral pool, so that plaintiffs would be left "holding the bag" with claims for repayment against insolvent shell companies around the globe. Plaintiffs allege that defendants "engineere[ed] a vertically-integrated fraud designed to plunder the proceeds from the Notes for their own personal enrichment." Plaintiffs allege, inter alia, that the servicer (CPM) directed a substantial portion of the proceeds from the notes to Vendor for "development services" and to Manager in the form of inflated management fees that, based on information and belief, were calculated using knowingly inflated valuations of the product portfolio.
Plaintiffs allege that Fund and individual defendants Mayo and Evans-Freke created a "web of overlapping Celtic entities." Plaintiffs note that in addition to serving as managing general partners of Fund, Mayo and Evans-Freke serve or served as two of the issuer's three directors, as managing general partners of the servicer, as managing general partners of Manager, and as directors of Vendor and guarantors. Plaintiffs allege that the individual defendants' "domination" of the issuer was "so all-encompassing" that they simultaneously signed the transaction documents on behalf of the entities on both sides of the transaction. Plaintiffs allege that Fund, Evans-Freke and Mayo were "intimately involved" in the marketing of the notes and "emphasized" their expertise over that of the issuer. Plaintiffs maintain that Fund "unilaterally controlled" the development of the products in the security pool from which plaintiffs were to be repaid. Plaintiffs maintain that the servicer (CPM) was the only entity within the Celtic group that had any employees or actual operations and that the rest of the companies were shell corporations or corporate general partners set up to hold assets and obtain beneficial tax treatment. Plaintiffs quote from the sworn statement of the former general counsel of CPM to the effect that the various companies were operated as "a single enterprise," with Mayo and Evans-Freke "responsible for all operational and management decisions." Plaintiffs allege that Evans-Freke and Mayo "puppeteered" the issuer and its subsidiaries "as if they were all part of a single, consolidated operation."
The Agreements
The notes indenture, dated as of January 31, 2007, contains a forum selection clause providing that
"each of the parties hereto agrees that the U.S. federal and State of New York courts located in the Borough of Manhattan, The City of New York[,] shall have jurisdiction to hear and determine any suit, action or proceeding, and to settle any disputes, which may arise out of or in connection with this Indenture and, for such purposes, submits to the jurisdiction of such courts."
Mayo executed the indenture on behalf of the issuer and the "Guarantor[s]." The indenture defines "Guarantors" as "the Issuer Subsidiaries, the Product Subsidiaries, and TDT." The "Product Subsidiaries" are defined as "the Issuer Product Subsidiaries, the TDT Product Subsidiaries and any Additional Product Subsidiary." The latter is defined as "any 75% Owned Subsidiary of Celtic [defined as Fund therein] that acquires any rights or interests (directly or [*4]indirectly) in an Additional Product after the Closing Date." A "75% Owned Subsidiary" is defined to include any entity of which at least 75% is directly or indirectly owned or controlled by a person, by such person and one or more of such person's subsidiaries, or by one or more subsidiaries of such person. An "Additional Product" is "any drug development project acquired, directly or indirectly, by Celtic or any Subsidiary thereof following the Closing Date that is financed by Additional Product Funds or funds from the Issuer Closing Account." "Additional Product Funds" are the funds that noteholders paid to purchase the notes.
On the same date the indenture was executed, the issuer, guarantors, and CPM executed a servicing agreement. The preamble to the servicing agreement states that the parties entered into the servicing agreement for CPM to "perform[] certain services with respect to the Indenture, the Notes and the Guarantees." The servicing agreement obligates CPM to maintain the issuer's bank accounts, prepare distribution reports for the noteholders, and deliver quarterly reports and financial statements to the noteholders.
The servicing agreement is governed by New York law and similarly contains a New York forum selection clause. Evans-Freke executed the servicing agreement on behalf of CPM, the issuer, and various guarantors.
The Litigation
The issuer is alleged to have defaulted on its obligations to plaintiffs on June 15, 2012. Plaintiffs commenced this action in 2016, and in 2018 they filed a first amended complaint alleging, inter alia, causes of action for fraudulent conveyance and breach of the indenture and servicing agreements. Insofar as relevant here, plaintiffs allege that the court has jurisdiction over Manager, TDTH, and the individual defendants because they are "closely related" to the signatories of the relevant agreements, and over Vendor, TDTH and the FIX entities as "Additional Product Subsidiary Guarantors."
Various defendants moved to dismiss the complaint pursuant to CPLR 3211. The court held that the individual defendants, TDTH, Fund,[FN2] and the Manager were bound by the forum selection clauses in the relevant agreements and subject to jurisdiction in New York based on the "closely related" doctrine.
The motion court found that plaintiffs had adequately alleged that the FIX entities qualified as "Additional Product Subsidiaries" and were therefore bound by the forum selection clauses.
The motion court found as to Auven that plaintiffs had adequately pleaded successor liability (to CPM) as a basis for jurisdiction, stating that "whether successor liability can successfully be established should be determined after discovery."
The motion court granted Vendor's motion to dismiss on the ground that it was not a direct or indirect subsidiary of a contracting party.
Seven defendants perfected their appeals: Manager, TDTH, the FIX entities, Auven, and Mayo and Evans-Freke who, as previously indicated, has since withdrawn his appeal. Plaintiffs cross-appeal to the extent the court granted Vendor's motion to dismiss for lack of personal jurisdiction.
Analysis
Forum Selection Clause
Defendants maintain that the assertion of jurisdiction over them based on the "closely related" doctrine was improper, as they lack minimum contacts with the forum. Plaintiffs maintain that minimum-contacts analysis is inapposite where jurisdiction is predicated on consent to a forum selection clause under a "closely related" analysis. A "closely related" [*5]analysis requires that the relation of the parties be such as to make application of the clause foreseeable, rendering a separate minimum-contacts analysis unnecessary.
It is a general principle that only the parties to a contract are bound by its terms (see Tate & Lyle Ingredients Ams., Inc. v Whitefox Tech, USA, Inc., 98 AD3d 401 [1st Dept 2012]). A non-signatory may be bound by a contract under certain limited circumstances, including as a third-party beneficiary or an alter ego of a signatory or where it is a party to another related agreement that forms part of the same transaction (id.).
A non-signatory may also be bound by a forum selection clause where the non-signatory and a party to the agreement have such a "close relationship" that it is foreseeable that the forum selection clause will be enforced against the non-signatory (see generally Freeford Ltd. v Pendleton, 53 AD3d 32, 39 [1st Dept 2008], lv denied 12 NY3d 702 [2009]). The rationale for binding non-signatories is based on the notion that forum selection clauses "promote stable and dependable trade relations," and thus, that it would be contrary to public policy to allow non-signatory entities through which a party acts to evade the forum selection clause (Tate & Lyle, 98 AD3d at 402).
In Tate & Lyle, we applied the "closely related" doctrine where a plaintiff signatory was seeking to enforce a forum selection clause as against a defendant non-signatory. In determining whether a non-signatory is "closely related" to a signatory, we reasoned that the inquiry should focus on whether "the nonparty's enforcement of the forum selection clause is foreseeable by virtue of the relationship between the nonparty and the party sought to be bound" (98 AD3d at 402 [internal quotation marks omitted]). We found that the record demonstrated that the counterclaim defendant, the plaintiff's parent company, was closely related to its wholly-owned subsidiary and a signatory to a licensing agreement and therefore that it was "reasonably foreseeable" that it would be bound by a forum selection clause (id. at 402-403). The CEO of the parent company testified that it was he who made the decision not to return the defendant's technology when the defendant had demanded its return and his decision to continue to use the technology at the subsidiary's plant. It was clear that the entities not only consulted with each other, but also were both involved in the decision-making process from the inception of the agreement through the commencement of the litigation. Thus, the parent could not seriously maintain that it was not reasonably foreseeable that the forum selection clause would be asserted against it.
In Universal Inv. Advisory SA v Bakrie Telecom Pte., Ltd. (154 AD3d 171, 178-179 [1st Dept 2017], we found that jurisdiction could be asserted against a non-signatory defendant based on the "closely related" doctrine, reversing and remanding for further discovery. The plaintiffs in Bakrie alleged that the individual defendants, by virtue of their senior management positions and decision-making authority, and the defendant's parent company, as principal shareholder, had actual knowledge that the subsidiary was insolvent and incapable of meeting its obligations under the notes, yet participated in and promoted the offering. We found this enough, at a preliminary stage, to permit jurisdictional discovery as to the individual defendants' actual knowledge and role in the offering (id. at 179-180; see also Borden LP v TPG Sixth St. Partners, 173 AD3d 442 [1st Dept 2019]).
It is true, as defendants assert, that the motion court did not undertake a separate minimum-contacts analysis. However, the concept of foreseeability is built into the closely-related doctrine, which explicitly requires that the relationship between the parties be such that it is foreseeable that the non-signatory will be bound by the forum selection clause.[FN3]
Thus, courts have recognized that a consent to jurisdiction by virtue of the "close relationship" between the non-signatory and contracting party obviating the need for a separate analysis of constitutional propriety (see Recurrent Capital Bridge Fund I, LLC v ISR Sys. & Sensors Corp., 875 F Supp 2d 297, 306 [SD NY 2012]; Power Up Lending Group Ltd. v Nugene Intl., Inc., 2019 WL 989750, *3 n 3 [ED NY, Mar. 1 2019] ["Since plaintiff has met its burden of making a prima facie showing that [defendant nonsignatory] is closely related enough to the contractual relationships at issue based upon his vertical relationship' with Nugene, such that he is bound by the forum selection clause in the subject Agreements, the exercise of personal jurisdiction over him in this case is consistent with federal due process requirements"] [citation omitted]).
Arcadia Biosciences, Inc. v Vilmorin & Cie (356 F Supp 3d 379 [SD NY 2019]), upon which defendants heavily rely, is distinguishable. The plaintiff in Arcadia Biosciences was attempting to hold a non-signatory future affiliate of the defendant to a forum selection clause. It was not reasonably foreseeable that the future affiliate — formed eight years after the contract had been executed — would be bound by the forum selection clause.
Plaintiffs adequately allege that Mayo, TDTH, and Manager are closely related to signatories such that enforcement of the forum selection clause against them was foreseeable (see e.g. Firefly Equities LLC v Ultimate Combustion Co., 736 F Supp 2d 797, 800 [SD NY 2010]; Bakrie, 154 AD3d at 179). Mayo served as co-managing general partner of Fund (with Evans-Freke) and as one of the issuers' three directors. Mayo and Evans-Freke executed the relevant agreements on behalf of whichever Celtic entity was party to that agreement. Mayo, for example, executed the indenture on behalf of the issuer and 16 named guarantors, as well as an undertaking on behalf of the issuer and Fund. Evans-Freke executed the servicing agreement on behalf of the issuer, the servicer, 16 named guarantors, and Manager. Among other things, the prospectus for the notes advised that the issuer was "highly dependent upon our senior management, particularly Stephen Evans-Freke and John Mayo, [] Celtic's two Managing General Partners," warning that "[i]f we fail to . . . keep senior management, we may be unable to successfully develop the Products, conduct our clinical trials, identify Additional Products and, ultimately, sell our rights and interests in the Products" (see e.g. Firefly Equities LLC, 736 F Supp 2d at 800 [foreseeable that forum selection clause would be enforced against corporate president in his individual capacity where he signed the contract in his representative capacity]).
TDT, which executed the indenture, is a subsidiary of TDTH. The indenture references TDTH throughout, and incorporates as a "Transaction document[]" a subscription agreement between the issuer and TDTH. Thus, enforcement of the forum selection clause against TDTH was foreseeable by virtue of TDTH's ownership interest in and control over TDT and its involvement in the notes offering.
Manager is CPM's general partner and executed the servicing agreement on its behalf (via Evans-Freke as managing general partner). The servicing agreement obligated CPM to "perform[] certain services with respect to the Indenture, the Notes and the Guarantees." Enforcement of the forum selection clause against Manager was foreseeable by virtue of Manager's role as CPM's general partner and CPM's significant role in the transaction. Manager is amenable to personal jurisdiction in any event as the general partner of CPM, which is subject to the clause (see U.S. Bank Natl. Assn. v Ables & Hall Bldrs., 582 F Supp 2d 605, 615-616 [SD [*6]NY 2008]).
Plaintiffs' allegations are thus enough, at this preliminary stage, to permit jurisdictional discovery as to the various defendants' knowledge of and role in the offering (see Bakrie, 154 AD3d at 179-180).
"Additional Product Subsidiaries"
"Absent explicit language demonstrating the parties' intent to bind future affiliates of the contracting parties, the term affiliate' includes only those affiliates in existence at the time that the contract was executed" (Ellington v EMI Music, Inc., 24 NY3d 239, 246 [2014]). Where, however, the parties "intend[] to bind future affiliates, they [may] include[] language expressing that intent" (id.; see also Georgia Malone & Co. v E & M Assoc., 163 AD3d 176, 186 [1st Dept 2018] ["The language following the signatures also indicates an intent to bind all future entities related to E & M, its employees and officers, as well as successors"]).
Here, the express terms of the indenture make clear that the parties intended future Celtic entities to qualify as "Guarantors" by virtue of benefitting from the proceeds of the offering. An "Additional Product Subsidiary" is defined as "any 75% Owned Subsidiary of Celtic [defined as Fund therein] that acquires any rights or interests (directly or indirectly) in an Additional Product after the Closing Date" (emphasis added). Similarly, "Additional Product" is defined as "any drug development project acquired, directly or indirectly, by Celtic or any Subsidiary thereof following the Closing Date that is financed by Additional Product Funds or funds from the Issuer Closing Account" (emphasis added). Thus, the indenture explicitly contemplated that if noteholder funds were expended after the closing date by any entity 75% owned by Fund to develop products, that entity would qualify as an "Additional Product Subsidiary," i.e., a "Guarantor[]" under the indenture.
Plaintiffs specifically allege that TDTH and the FIX entities qualify as "Additional Product Subsidiar[ies]." TDTH is at least 75% owned by Fund and owns 100% of TDT, which plaintiffs allege has developed "Additional Products" using "funds that the Notes generated to develop new products," i.e., "Additional Product Funds."[FN4] The FIX entities are wholly-owned subsidiaries of the issuer, which is owned by Fund, and are alleged to have used proceeds from the notes to acquire interests in Additional Products from a company called Inspiration Biochemicals.
Plaintiffs have also adequately alleged, at this stage, that the Vendor is an "Additional Product Subsidiary." The motion court found that Vendor did not qualify as an "Additional Product Subsidiary" because it was not a subsidiary of the issuer. However, the indenture uses the term "Celtic" to refer to Fund, i.e., Celtic Pharmaceutical Holdings, L.P., which sits above the issuer on the organizational chart. Plaintiffs allege that Vendor is more than 75% owned by Fund, and that it acquired rights in "Additional Product[s]" after the issuance of the notes.
Liability of Auven as Successor to CPM
If successorship is established, a forum selection clause will bind a contracting party's successor in interest (see Aguas Lenders Recovery Group LLC v Suez, S.A., 585 F3d 696, 701 [2d Cir 2009]). New York recognizes four exceptions to the general rule that an acquiring corporation is not liable for the liabilities of the acquired corporation: (1) a buyer who formally assumes the seller's debts; (2) a buyer who de facto merged with the seller; (3) transactions undertaken to defraud creditors; and (4) where the buyer may be considered a "mere continuation" of the seller (id. at 702).
The hallmarks of a de facto merger include a continuity of ownership; cessation of ordinary business and dissolution of the acquired corporation as soon as possible; assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and continuity of management, personnel, physical location, assets and general business operation (Fitzgerald v Fahnestock & Co., 286 AD2d 573, 574 [1st Dept 2001]). A court will "look to whether the acquiring corporation was seeking to obtain for itself intangible assets such as good will, trademarks, patents, customer lists and the right to use the acquired corporation's name" (id. at 575). The doctrine is based on the principle that a successor who "effectively takes over a company in its entirety should carry the predecessor's liabilities as a concomitant to the benefits it derives from the good will purchased" (id. [internal quotation marks omitted]).
Plaintiffs have adequately alleged, at this preliminary stage, that Auven was the successor to CPM, the servicer (see Fitzgerald, 286 AD2d at 574). Plaintiffs allege that a key element of the "bleed-out" scheme was the creation of successor funds and the transfer of assets and rights otherwise within the collateral pool to those funds. Plaintiffs note that whereas Fund, the issuer, and CPM are now insolvent and/or no longer operating, Evans-Freke continues to operate Auven as a profitable private equity firm focused, like its predecessor, on investing in novel drug development programs.
Plaintiffs cite the following in support of their theory that Auven is carrying on the business of CPM: Evans-Freke co-founded both CPM and Auven. He serves as one of two general partners of Auven and the managing general partner of Manager, which is the general partner of CPM. According to nonparty Averill Powell, the former general counsel to the Celtic Pharma and Celtic Therapeutics groups, Auven's predecessor agreed to "assume costs and liabilities related to the operation of CPM's New York office as of September 2009, including the costs and liabilities associated with salaries and bonuses for [Powers] and other junior carried interest limited partners." They shared overlapping investors, board members, and employees, including key management such as the general counsel, chief accounting officer, and head of clinical development. Plaintiffs allege that upon its formation, Auven did not set up separate payroll for employees who also worked for CPM. Plaintiffs note that Auven registered trademarks for "Celtic," "Celtic Pharma Group," "The Celtic Group," and "Celtic Pharma International," only "rebranding" following the issuer's default on the notes.
Auven argues that it is shielded from liability because Evans-Freke co-founded CPM and Auven with two different co-founders and thus ownership of the entities is not "identical." Continuity of ownership, however, does not mean identity of ownership (see Matter of Abreu v Barkin & Assoc. Real Estate, LLC, 136 AD3d 600, 602 [1st Dept 2016] [sole shareholder in predecessor owned 51% of successor]; Ladenburg Thalmann & Co. v Tim's Amusements, 275 AD2d 243, 248 [1st Dept 2000] [shareholder owned 20% of predecessor and 72% of successor]).
Auven maintains that it adopted bifurcation protocols to keep its operations distinct from those of the other Celtic Pharma entities, citing Evan-Freke's affidavit. Auven raises factual issues not capable of resolution at this preliminary stage. As the motion court found, "whether successor liability can successfully be established should be determined after discovery."
Standing under the Servicing Agreement
Plaintiffs are intended third-party beneficiaries of the indenture. Thus, they have standing to enforce the servicing agreement, which is part of the same transaction (see Tate & Lyle, 98 AD3d 401). The two contracts were executed on the same day, and the indenture incorporates the servicing agreement as one of the "Transaction Document[s]" that governs the notes. Indeed, the purpose of the servicing agreement was to implement and service the indenture. The preamble to the servicing agreement makes clear that CPM, the issuer, and the guarantors entered into the servicing agreement in order for CPM to "perform[] certain services with respect to the [*7]Indenture, the Notes, and the Guarantees" (emphasis added).
We have considered and rejected the other arguments for affirmative relief.
Accordingly, the order, Supreme Court, New York County (Eileen Bransten, J.), entered December 4, 2018, which, insofar as appealed from as limited by the briefs, granted defendant Celtic Pharma Development Services Bermuda Ltd.'s motion to dismiss the complaint as against it for lack of personal jurisdiction, denied the motions of defendants Targeted Delivery Technologies Holdings, Ltd. (TDTH), Celtic Pharma FIX, Ltd., Celtic Pharma FIX Venture, Ltd., Celtic Pharma Management Company, Ltd., Celtic Therapeutics Management LLLP doing business as Auven Therapeutics Management LLLP and as successor in interest to Celtic Pharma Management, L.P. (Auven), and John Mayo to dismiss the complaint as against them for lack of personal jurisdiction, and denied the motions of TDTH, Celtic Pharma Management Company Ltd., and Auven to dismiss claims arising out of the servicing agreement for lack of standing, should be
modified, on the law, to deny Celtic Pharma Development Services Bermuda Ltd.'s motion, and otherwise affirmed, without costs.
All concur.
Order, Supreme Court, New York County (Eileen Bransten, J.), entered December 4, 2018, modified, on the law, to deny Celtic Pharma Development Services Bermuda Ltd.'s motion, and otherwise affirmed, without costs.
Opinion by Manzanet-Daniels, J. All concur.
Acosta, P.J., Renwick, Manzanet-Daniels, Kapnick, González, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: MAY 21, 2020
CLERK



Footnotes

Footnote 1:Defendant Stephen Evans-Freke withdrew his appeal before oral argument.

Footnote 2:Fund has not appealed from the order denying its motion.

Footnote 3:While the published decision in Bakrie does not discuss due process, the Bakrie defendants made that argument (brief available at 2016 WL 11539017, *47-49). By denying the Bakrie defendants' motion to dismiss, we sub silentio rejected their due process arguments.

Footnote 4:Because the motion court found that TDTH was closely related to TDT, it did not reach the question of whether TDTH qualified as an "Additional Product Subsidiary."