BioPharma Credit PLC v Biogen Inc. (2024 NY Slip Op 51335(U))

[*1]

BioPharma Credit PLC v Biogen Inc.

2024 NY Slip Op 51335(U)

Decided on September 27, 2024

Supreme Court, New York County

Patel, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 27, 2024
Supreme Court, New York County

BioPharma Credit PLC, BPCR LIMITED PARTNERSHIP, BIOPHARMA CREDIT INVESTMENTS V (MASTER) LP, Plaintiffs,

against
Biogen Inc., REATA PHARMACEUTICALS, INC., Defendants.

Index No. 651981/2024

Counsel for Plaintiffs: Uri A. Itkin, Esq., Kaitlyn A. Tongalson, Esq., and Richard J. D'Amato, Esq., of AKIN GUMP STRAUSS HAUER & FELD LLP
Counsel for Defendants: Gary A. Bornstein, Esq., of CRAVATH, SWAINE & MOORE LLP

Anar Rathod Patel, J.

The following e-filed documents, listed by NYSCEF document number (Motion 002) 28—34, 38—46 were read on this motion to/for DISMISS.
Defendants Biogen Inc., and Reata Pharmaceuticals, Inc., (hereinafter collectively "Defendants") move to dismiss Plaintiffs BioPharma Credit PLC, BPCR Limited Partnership, and BioPharma Credit Investments V (Master) LP's (hereinafter collectively "Plaintiffs") claims for breach of contract pursuant to CPLR § 3211(a)(7).
Relevant Factual [FN1] and Procedural History
The present matter arises from a loan agreement (hereinafter "Loan Agreement") by and between Plaintiffs and Defendant Reata Pharmaceuticals (hereinafter individually "Reata"). NYSCEF Doc. No. 30 (Plaintiffs' Complaint). Plaintiff BioPharma Credit PLC is a trust incorporated in England and Wales, has its principal place of business in the United Kingdom, and is the "collateral agent under the loan agreement." Id. at ¶ 20. Plaintiff BPCR Limited Partnership, a subsidiary of Plaintiff BioPharma Credit PLC, is incorporated in and has its principal place of business in the United Kingdom. Id. at ¶ 21. Plaintiff BioPharma Credit Investments V (Master) LP is a limited partnership with its principal place of business in the Cayman Islands. Id. at ¶ 22. Plaintiffs BPCR Limited Partnership and BioPharma Credit Investments V (Master) LP are the designated lenders in the present matter. Id. at ¶¶ 21—22. 
Defendant Reata is a biopharmaceutical company incorporated in Delaware with its principal place of business in Plano, Texas. Id. at ¶ 22. Defendant Reata created and marketed [*2]Skyclarys (generic: Omaveloxolone), a medication intended to treat Friedreich's ataxia.[FN2]
Id. at ¶ 28. 
In May 2023, Plaintiffs entered into the Loan Agreement with Defendant Reata in which Plaintiffs agreed to loan Defendant Reata the sum of $275 million over the course of four (4) tranches denoted as Tranches A, B, C, and D. Id. at ¶¶ 1, 4. Tranches A, B, and C were mandatory tranches that Defendant Reata was required to withdraw, while Tranche D was optional. Id. at ¶ 31. Tranches A, C, and D were comprised of $75 million each, while Tranche B was $50 million. Id. at ¶¶ 30—31. Tranche A was funded on May 12, 2023. Id. at ¶ 30. Tranche B was funded on July 9, 2023. Id. at ¶ 30.
The remaining Tranches C and D were tied to commercial revenue thresholds for Skyclarys. Id. "Tranche C Net Sales Trigger" is activated when the earlier of the following conditions are met:
(a)(i) if the first commercial sale of omaveloxolone in the U.S. occurs on or before June 30, 2023, TTM Net Revenue having equaled or exceeded $40,000,000 for the trailing twelve-month period ended December 31, 2023, or (ii) if the first commercial sale of omaveloxolone in the U.S. occurs between (and including) July 1, 2023 and September 30, 2023, TTM Net Revenue having equaled or exceeded $40,000,000 for the trailing twelve-month period ended March 31, 2024 or (iii) if the first commercial sale of omaveloxolone in the U.S. occurs on or after October 1, 2023, TTM Net Revenue having equaled or exceeded $40,000,000 for the trailing twelve-month period ended June 30, 2024; and (b) TTM Net Revenue having equaled or exceeded $55,000,000 for any trailing twelve-month period ending on or prior to March 31, 2024; in each case of clauses (a)(i), (a)(ii), (a)(iii) and (b) above, as reasonably determined by a Responsible Officer of Borrower in good faith in accordance with GAAP and supported by Borrower's financial statements (including with respect to any portion of the applicable trailing twelve-month period included in the financial statements filed with the SEC).
NYSCEF Doc. No. 31 at 120 [FN3]
(Loan Agreement). Tranche C was a mandatory tranche and required that the $75 million be withdrawn upon being triggered and subsequently repaid or, alternatively, prepaid without withdrawal. Id. at § 2.2 (Term Loans). Said loan payments also include various fees and interests. Id. 
Similarly, Tranche D was triggered by certain revenue milestones. Id. at 121. Tranche D would be triggered when:
[W]ith respect to any trailing twelve-month period ending on or prior to December 31, 2024, TTM Net Revenue having equaled or exceeded $100,000,000; as reasonably [*3]determined by a Responsible Officer of Borrower in good faith in accordance with GAAP and supported by Borrower's financial statements (including with respect to any portion of the applicable trailing twelve-month period included in the financial statements filed with the SEC).
Id. at 122. Tranche D is not at issue here as Defendants never elected to, nor were they required to, draw on this tranche of the credit facility . NYSCEF Doc. No. 30 at ¶ 4.
On June 27, 2023, Defendant Reata announced that the Food and Drug Administration (FDA) granted final approval for the commercial sale of Skyclarys. Id. at ¶ 49. Subsequently, Defendant Reata disclosed publicly that Defendant Reata had made its first commercial sale of Skyclarys in June 2023. Id. at ¶ 51. Tranche B, worth $50 million, was funded on July 9, 2023. Id. at ¶ 30. On or about September 21, 2023, Defendant Reata sent Plaintiffs their total revenues for the months of July and August 2023, indicating approximately $28,519,000 in realized revenue during the preceding two months, and further projecting $14,199,673 in revenue for September 2023.[FN4]
Id. at ¶ 60. 
On July 28, 2023, Defendant Reata and Biogen Inc. (hereinafter individually "Biogen") announced Biogen's acquisition of Defendant Reata. Id. at ¶ 53. Defendant Biogen is a biotechnology company incorporated in Delaware with its principal place of business in Massachusetts. Id. at ¶ 24. Pursuant to the merger, on September 26, 2023, Defendant Reata became a wholly owned subsidiary of Defendant Biogen. Id. at ¶ 23. Plaintiffs allege that, as a result of this acquisition, Defendant Biogen became the successor to the loan pursuant to § 11.1(a) (Successors and Assigns) of the Loan Agreement. Id. at ¶ 61; NYSCEF Doc. No. 31 at 66.
On the same day (September 26, 2023), Defendant Biogen sought to prepay the loan and terminate the Loan Agreement. NYSCEF Doc. No. 30 at ¶ 61. Plaintiffs allege that Defendant Biogen paid an "amount equal to the Tranche A and B principal, as well as make-whole and prepayment premiums for Tranches A and B. Biogen's payment did not include the Tranche C Additional Consideration, Tranche C Makewhole Amount and Tranche C Prepayment Premium." Id. at ¶ 62. Defendant Reata argues that Defendant was not required to pay the fees associated with Tranche C, as Defendant Reata had not met the required trigger prior to its acquisition by Defendant Biogen. Id. at ¶ 65. Pursuant to § 7.1 (Payment Default) of the Loan Agreement, failure to pay "any such interest, premium, or Obligations" constitutes an event of Default. NYSCEF Doc. No. 31 at 57. Plaintiffs further allege that Defendant Biogen closed one of Defendant Reata's securities accounts, which held a balance of $20,927,994.74 and was used to secure the loan. Id. at ¶ 63. Plaintiffs notified Defendants of the default and accelerated the loan "due to Defendants' failure to pay the Tranche C additional Consideration, Tranche C Makewhole Amount and Tranche C Prepayment Premium, along with accrued Lender Expenses and accompanying default interest." Id. at ¶ 69. 
Plaintiffs commenced the present action by filing a Summons and Complaint on April 16, 2024. See NYSCEF Doc. Nos. 1—2. On May 29, 2024, all parties appeared before this Court [*4]for a Preliminary Conference, during which Defendants stated that they intended to file a motion to dismiss. See NYSCEF Doc. No. 36 (5/29/24 Tr.). Defendants filed the present motion on May 31, 2024. Defendants seek to dismiss the Complaint for failure to state a cause of action pursuant to CPLR § 3211 (a)(7). See NYSCEF Doc. Nos. 28—34. 
Defendants' Motion to Dismiss
Defendants argue that the Complaint does not sufficiently allege: (1) that Plaintiffs were owed payments pursuant to Tranche C of the Loan Agreement; (2) that, even if the trigger had been met, Defendant Reata was obligated to close on Tranche C prior to its acquisition and subsequent termination of the Loan Agreement; and (3) a cause of action against Defendant Biogen, which was not a party to the Loan Agreement nor a successor to Defendant Reata. 
Defendants assert that the Complaint does not sufficiently allege that Defendants met the requisite triggers requiring closure of Tranche C of the Loan Agreement. NYSCEF Doc. No. 28 at 12—19 (Defs. Mem. of Law). Defendants state that the first commercial sale of Skyclarys occurred on June 27, 2023, and subsection (a)(i) of Tranche C Net Sales Trigger requires revenue to be calculated based on the trailing twelve months ("TTM") ending on December 31, 2023. Id. at 13; see also NYSCEF Doc. No. 31 at 120. Defendants point to the specific language in subsection (a)(i), which states that "TTM Net Revenue having equaled or exceeded $40,000,000 for the trailing twelve-month period ended December 31, 2023." NYSCEF Doc. No. 31 at 120 (emphasis added). Defendants argue that the language of Tranche C Net Sales Trigger prohibits calculating the TTM Net Revenue prior to December 31, 2023, three months after the Loan Agreement's termination. NYSCEF Doc. No. 28 at 13. Defendants observe the similarity in this language with that used in subsections (a)(ii), (a)(iii)—"TTM Net Revenue having equaled or exceeded $40,000,000 for the trailing twelve-month period ended March 31, 2024"; "TTM Net Revenue having equaled or exceeded $40,000,000 for the trailing twelve-month period ended June 30, 2024." Id. (emphasis added). Defendants contrast this language with the language of subsection (b)—"TTM Net Revenue having equaled or exceeded $55,000,000 for any trailing twelve-month period ending on or prior to March 31, 2024." Id. at 14 (emphasis added). Defendants contend that this contrasting language conveys that Plaintiffs intended a certain date as to subsections (a)(i), (a)(ii), and (a)(iii) which had not been reached. Id. at 13—14; see also NYSCEF Doc. No. 31 at 120. 
Defendants also propose a hypothetical situation in which the first commercial sale of Skyclarys occurred in the third quarter of 2023 to argue that Plaintiffs' interpretation of subsection (a)(i), when applied to subsection (a)(ii), would render subsections (a)(ii) and (b) duplicative. NYSCEF Doc. No. 28 at 14—15. Defendants argue that such a reading is antithetical to contract interpretation as it renders the distinct different language in the subsections as meaningless. Id.
Defendants next turn to subsection (b) of the Tranche C Net Sales Trigger and argue that Plaintiffs' Complaint "forecloses the possibility that the $55 million trigger was satisfied by the end of August 2023." Id. at 15. Defendants argue that Defendants terminated the Loan Agreement on September 26, 2023, thus rendering August 2023 the last month where revenue was calculable based on generally accepted accounting principles ("GAAP"). Id. at 16. Defendants argue that Skyclarys had not yet reached $55 million and posit that Plaintiffs' Complaint admits the same. Id. at 16—19. 
Defendants argue, in the alternative, that even if the Tranche C trigger amounts had been [*5]met, Defendant Reata was not obligated to close on Tranche C before terminating the Loan Agreement. Id. at 20. Defendants state that if the Tranche C trigger was met, Defendant Reata was required to complete an "Advance Request Form" within five business days after the occurrence of the Tranche C Net Sales Trigger or before March 31, 2024. Id. at 20; see also NYSCEF Doc. No. 31 at 23. Said form required Defendant Reata to specify the date on which the loan was funded, so long as the date selected was at least 45 days following the delivery of form. NYSCEF Doc. No. 28 at 20; NYSCEF Doc. No. 31 at 126. As such, Defendants posit that Defendant Reata was not required to seek funding of Tranche C for, approximately, 45—52 days after meeting the Tranche C triggers. NYSCEF Doc. No. 28 at 20—21. Defendants argue that because the Loan Agreement was terminated less than 52 days after Plaintiffs allege the trigger was achieved, Defendants were not yet required to withdraw Tranche C at the time of the termination. Id. at 20—21. 
Defendants argue that Plaintiffs' cause of action against Defendant Biogen is "fundamentally flawed," as Defendant Biogen "does not owe Plaintiffs any obligations under the [Loan] Agreement whatsoever." Id. at 24. Defendants argue that Defendant Biogen was not a party to the Loan Agreement in May 2023, and that Plaintiffs' assertion that Defendant Biogen is Defendant Reata's successor is conclusory. Id. at 24—25. Defendants indicate that Defendant Reata continues to operate independently of Defendant Biogen despite the former becoming a subsidiary of the latter. Id.
Plaintiffs' Opposition
Plaintiffs preliminarily argue that the Complaint, as filed, sufficiently pleads a claim for breach of contract as against both Defendants. See NYSCEF Doc. No. 45 (Pls. Mem. of Law). Plaintiffs argue that the provisions of the Loan Agreement were drafted to provide Defendant Reata with "maximum flexibility so long as it reached or believed it reached the applicable revenue milestones within the given time." Id. at 14. Plaintiffs assert that Defendants' interpretation of the Loan Agreement contradicts the parties' intent (if the contract was carried out in its entirety), as it would leave Defendant Reata without $75 million in funding for months. Id. at 14. Plaintiffs also point to the definition of "TTM Net Revenue" as it appears in the Loan Agreement and observe that it states that TTM Net Revenue "may be determined 'as of any date' and 'for any period.'" Id. at 14; see also NYSCEF Doc. No. 31 at 116. 
Plaintiffs further argue that Defendants' interpretation of the Loan Agreement would render subsection (a)(iii) of the Tranche C Net Sales Trigger illogical, as it would require Defendant Reata to complete their accounting by May 15, 2024, to meet the June 30, 2024, deadline. NYSCEF Doc. No. 45 at 15; see also NYSCEF Doc. No. 31 at 116. 
Plaintiffs next contend that Defendants' argument regarding the relative language of unrelated provisions of the Loan Agreement, is improper. NYSCEF Doc. No. 45 at 17. Moreover, Plaintiffs argue that Defendants could have calculated Defendant Reata's September 2023 revenue in accordance with GAAP and that nothing in the GAAP forbids calculating revenue before the end of a month. Id. at 18. Plaintiffs point to Defendant Biogen's November 2023 Form 10-Q, which shows that Defendant Biogen had calculated Defendant Reata's assets and liabilities as of September 26, 2023. Id.; see NYSCEF Doc. No. 39 at 17—18 (Biogen Form 10-Q). 
Plaintiffs reiterate that Tranche C was a mandatory tranche and that Defendants were required to request the loan within five days of meeting the defined trigger. NYSCEF Doc. No. [*6]45 at 19. Defendants' failure to request the tranche despite triggering it, and instead moving to terminate the Loan Agreement, constituted an event of default. Id. at 19—20. 
Plaintiffs argue that the non-occurrence of the Tranche C Closing Date, which is the "date on which the Tranche C Loan is advanced by Lenders" (NYCEF Doc. No. 31 at 120), is not a defense, as the Closing Date simply refers to "the date when Tranche C was funded." NYSCEF Doc. No. 45 at 20. Plaintiffs contend that Defendants are attempting to justify the non-occurrence of a condition precedent by preemptively breaching the contract prior to its occurrence. Id. at 20—21. Plaintiffs conclude that Defendants' breach of contract occurred when Defendants triggered Tranche C and failed to request the loan it in a timely manner. Id. at 21—22. 
Finally, Plaintiffs argue that Defendant Biogen is a successor pursuant to the Loan Agreement. Id. at 24. Plaintiffs point to Defendant Biogen's public securities filings to demonstrate that Defendant Biogen assumed all of Defendant Reata's liabilities. Id. "Moreover, Biogen's securities filings also reveal that the surviving Reata entity is nothing more than a shell entity." Id. Plaintiffs posit that Defendant Biogen: (1) has replaced all of Defendant Reata's staff and executives; and (2) that Defendant Reata's previous website, now redirects to "Biogen.com." Id.
Legal Discussion
On a motion to dismiss brought pursuant to CPLR § 3211(a)(7), "pleadings are to be afforded a liberal construction, allegations are taken as true, the plaintiff is afforded every possible inference, and a determination is made only as to whether the facts as alleged fit within any cognizable legal theory." CSC Holdings, LLC v. Samsung Elecs. Am., Inc., 146 N.Y.S.3d 17, 18 (2021) (internal citations omitted). Nevertheless, "[d]ismissal of the complaint is warranted if the [movant] fails to assert facts in support of an element of the claim, or if the factual allegations and inferences drawn from them do not allow for an enforceable right of recovery." Connaughton v. Chipotle Mexican Grill, Inc., 29 NY3d 137, 142 (2017) (internal citations omitted). Courts will grant a motion to dismiss where a movant states a cognizable cause of action but fails to assert a material fact necessary to meet an element of the claim. See e.g., Arnon Ltd v. Beierwaltes, 3 N.Y.S.3d 31, 33 (2015). To state a claim for breach of contract, the plaintiff, "usually must allege that: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations." 34-06 73, LLC v. Seneca Ins. Co., 198 N.E.3d 1282, 1287 (NY 2022) (internal citations omitted). 
The parties do not dispute that Plaintiffs have sufficiently pled the existence of a contract by and between Plaintiffs and Defendant Reata. NYSCEF Doc. No. 36 at 3. Additionally, there is no dispute that Tranches A and B were paid out by Lenders pursuant to the valid contract. Id. Thus, the first and second elements required to plead a breach of contract claim have been met as to Defendant Reata. 
Plaintiffs' Complaint alleges that Defendant Reata's net revenue from the sale of Skyclarys triggered Tranche C, causing fees associated with Tranche C to become due. See NYSCEF Doc. No. 30 at ¶¶ 61—70. Defendants rebut this argument based on evidence purporting to show that the Tranche C payments were not due either because Tranche C was not triggered or, in the alternative, that Tranche C's funding was not automatic. NYSCEF Doc. No. 28 at 13—21. "[A] defendant can submit evidence in support of the motion attacking a well-[*7]pleaded cognizable claim [I]f the defendant's evidence establishes that the plaintiff has no cause of action (i.e., that a well-pleaded cognizable claim is flatly rejected by the documentary evidence), dismissal would be appropriate." Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc., 980 N.Y.S.2d 21, 26 (1st Dept. 2014). 
Loan Agreement Ambiguity Demands Denial
The prevalent issue here is the language of the Loan Agreement. The parties disagree as to the intended interpretation of certain terms of the Loan Agreement. NYSCEF Doc. Nos. 28, 45. "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (NY 2002). "Interpreting a contract 'is the process of determining from the words and other objective manifestations of the parties what must be done or forborne by the respective parties in order to confirm to the terms of their agreements.'" Tomhannock, LLC v. Roustabout Resources, LLC, 128 N.E.3d 674, 675 (NY 2019). "The best evidence of what parties to a written agreement intend is what they say in their writing." Slamow v. Del Col, 594 N.E.2d 918, 919 (NY 1992). "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Greenfield, 780 N.E.2d at 170 (NY 2002). "A contract is ambiguous if 'on its face [it] is reasonably susceptible of more than one interpretation.' If the court concludes that a contract is ambiguous, it cannot be construed as a matter of law, and dismissal under CPLR 3211(a)(7) is not appropriate." Telerep, LLC v. U.S. Intern. Media, LLC, 903 N.Y.S.2d 14, 15 (1st Dept. 2010). 
Defendants posit that the language of the Loan Agreement necessarily establishes that Plaintiffs were not owed the additional fees and payments for Tranche C. NYSCEF Doc. No. 28. Defendants specifically dispute that: (1) GAAP, as necessitated by the Loan Agreement, precludes calculating revenue before termination of the Loan Agreement due to the "Principle of Periodicity"[FN5]
and other provisions within the Loan Agreement; and (2) even if revenue is calculable, the language of the contract does not render Tranche C automatically funded when the trigger is met, due to precedent requirements in the Loan Agreement. Id. Plaintiffs, however, interpret the same provisions to mean exactly the opposite. See NYSCEF Doc. No. 45.
The provisions disputed by these parties could be reasonably interpreted in either direction. Said provisions are either undefined within the four corners of the Loan Agreement or have such a broad definition that, absent extrinsic evidence, the parties' intent cannot be discerned. For instance, the Loan Agreement states that Tranche C is triggered when certain milestones are met based on the calculation of "TTM Net Revenue." NYSCEF Doc. No. 31 at 120. The "TTM Net Revenue" definition states that it is calculable "as of any date of determination," but, in the same sentence, states that it is to be "determined in accordance with GAAP." Id. at 122. GAAP is defined in the same contract to include: (1) "the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants;" (2) "statements and pronouncements of the Financial Accounting [*8]Standards Boards;" and/or (3) "such other statements by such other Person as may be approved by a significant segment of the accounting profession." Id. at 89. Considering the breadth of the Loan Agreement's definition of GAAP, the remainder of the definitions are deemed ambiguous. 
Defendants attempt to resolve the ambiguity of the Loan Agreement through extrinsic evidence. Extrinsic evidence is any "[e]vidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement." EVIDENCE, Black's Law Dictionary (12th ed. 2024). "If a contract is ambiguous, a court may look to extrinsic evidence to resolve the ambiguity." Schulte Roth & Zabel LLP v. Metro. 919 3rd Ave. LLC, 164 N.Y.S.3d 104 (1st Dept. 2022). In support of Defendants' motion to dismiss, Defendants submitted the Financial Accounting Standard Board's (hereinafter "FASB") "Accounting Standards Update" from May 2014. NYSCEF Doc. No. 33. The FASB document states that:
An entity shall apply a single method of measuring progress for each performance obligation satisfied over time, and the entity shall apply that method consistently to similar performance obligations and in similar circumstances. At the end of each reporting period, an entity shall remeasure its progress toward complete satisfaction of a performance obligation satisfied over time.
Id. at 37. Defendants' filing manifests that GAAP mandates consistent reporting periods to abide by FASB standards; however, Defendants' evidence remains insufficient. As noted supra the Loan Agreement includes three possible definitions, while Defendants have only addressed one. 
Further, Defendants have not provided this Court with the necessary financial reports. The absence of Defendants' calculations and methodologies raise two questions: (1) whether Defendants properly applied FASB's accounting standards to justify the application of the single definition; and (2) the accuracy of Defendants' conclusions. Regarding question (1), as Plaintiffs identified, Defendants have previously forgone the FASB standards when Defendants calculated for Defendant Reata's acquisition in Defendant Biogen's 10-Q filing. NYSCEF Doc. No. 39 at 18—19. Defendant Biogen's 10-Q filings indicate that Defendants had calculated the assets, revenues and liabilities of Defendant Reata before the end of September 2023. Id. As to question (2), Defendants' claim that the complaint fails to state a cause of action because the revenue trigger was not reached is unsupported. Again, according to Defendant Biogen's own 10-Q filings, some unknown calculations were made, and there remains the possibility that Skyclarys netted Defendants sufficient revenue to trigger Tranche C. 
Moreover, the Parties dispute whether the Loan Agreement rendered funding of Tranche C automatic. As noted, supra, Defendants argue that prior to funding Tranche C, Defendants were required to file an "Advance Request Form," within five business days of reaching the required revenue total, and further select a funding date at least 45 days later. NYSCEF Doc. No. 28 at 20—24. Otherwise, Tranche C would not be funded, and no additional payments by Defendants would be required. Id. Defendants posit that the contract was terminated before the 45—52-day period required to fund Tranche C. Id. Plaintiffs, however, disagree and assert that Tranche C was automatically funded upon the Triggering revenue goals having been met, rendering the "Advance Request Form" and 45-day waiting period mere formalities. NYSCEF Doc. No. 45 at 20—22. The Loan Agreement is entirely silent as to the interplay of the Advance Request Form, the 45-day waiting period, and the Tranche C TTM Net Revenue trigger. See [*9]generally NYSCEF Doc. No. 31. Movants here have failed to provide extrinsic evidence sufficient to allow this Court to determine whether Tranche C was automatically funded. Consequently, there remains an ambiguity in the Loan Agreement that cannot be resolved on a motion to dismiss.
Fundamentally, the parties rely upon their interpretation of contractual terms to argue: (1) whether or not Tranche C was triggered; and (2) whether or not said triggering caused immediate funding of Tranche C. Defendants conclude that it is not possible to calculate whether the revenue milestone was hit since it could not be calculated as of the end of a quarter or end of a month, while Plaintiffs conclude that the revenue milestone can be calculated as of any date and for any period. Moreover, Defendants conclude that, even if triggered, funding of Tranche C would not occur for at least 45 days following the trigger, while Plaintiffs conclude that funding of Tranche C occurred immediately upon Defendants meeting any of the Tranche C trigger requirements. The Court finds that either interpretation may be reasonable due to the ambiguity and/or breadth of the Loan Agreement. Thus, the countervailing interpretations of the relevant contractual terms preclude the dismissal of Plaintiff's claim at this stage in the litigation. 
Defendants' Reliance on Conditions Precedent is Misplaced
Defendants argue that the (1) Tranche C Additional Consideration; (2) Tranche C Makewhole Amount; (3) Tranche C Prepayment Premium; and (4) Lenders Expenses require a condition precedent before they are owed. First, Defendants argue that the Tranche C Additional Consideration became due either: (1) when Tranche C became funded 45—52 days after meeting the Tranche C Net Sales Trigger; or (2) no later than May 15, 2024. NYSCEF Doc. No. 28 at 21—22; see also NYSCEF Doc. No. 31 at 120 (Tranche C Closing Date Definition). Next, Defendants contend that the Tranche C Makewhole Amount and Tranche C Prepayment Premium, require either: (1) that Plaintiffs provide Defendants with the Tranche C funds; or (2) the occurrence of the Tranche C Closing Date. NYSCEF Doc. No. 28 at 22—23. Finally, as to the Lender Expenses, Defendants argue that Plaintiffs are only owed that sum after Defendants receive a written demand. NYSCEF Doc. No. 28 at 23; see also NYSCEF Doc. No. 31 at 14.
However, under New York Law, "[a] condition precedent is linked to the implied obligation of a party not to 'do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" A.H.A. Gen. Const., Inc. v. New York City Hous. Auth., 699 N.E.2d 368 (NY 1998) (quoting Kirke La Shelle Co. v. Paul Armstrong Co., 188 N.E. 163 (NY 1933). "The general rule is, as it has been frequently stated, that a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." Kooleraire Serv. & Installation Corp. v. Bd. of Ed. of City of New York, 268 N.E.2d 782 (NY 1971); see also Young v. Hunter, 6 NY 203 (1852) ("It is a well settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself."). 
Defendants admit that Defendant Reata terminated the Loan Agreement on September 26, 2023. NYSCEF Doc. No. 28 at 5. Defendants further admit that said termination occurred before: (1) Plaintiffs provided Defendants with the Tranche C funds; (2) the 45—52-day period prior to funding had elapsed; (3) Defendants received the necessary written demand from Plaintiffs; and (4) the Tranche C Closing Date had elapsed. Id. at 5—7. Defendants interfered with the conditions precedent by terminating the written agreement prior to the occurrence of the [*10]conditions precedent. Defendants cannot now avail themselves of these conditions and argue that their non-occurrence absolves Defendants of liability.
Plaintiffs' Complaint as to Defendant Biogen is Sufficiently Pled
The Loan Agreement by and between Defendant Reata and Plaintiffs does not define "successor" as it appears in the Loan Agreement. See generally NYSCEF Doc. No. 31. Considering ambiguities in contractual terms are to be interpreted against the drafter, the Court cannot sua sponte implicate Defendant Biogen based on the Loan Agreement alone. See Willis v. New York City Police Dept., 625 N.Y.S.2d 43 (1st Dept. 1995).
"A parent corporation will not be held liable for the torts or obligations of a subsidiary unless it can be shown that the parent exercised complete dominion and control over the subsidiary." Potash v. Port Auth. of New York and New Jersey, 719 N.Y.S.2d 290, 291 (2d Dept. 2001); see also Am. Real Est. Holdings Ltd. Partn. v. Citibank, N.A., 844 N.Y.S.2d 288 (1st Dept. 2007) (holding that a defendant parent company could not be held liable for breach of a lease by its subsidiary). Plaintiffs are required to show that Defendant Reata was "within the exclusive control," of Defendant Biogen. Mitchell v. TAM Equities, Inc., 812 N.Y.S.2d 611 (2d Dept. 2006). However:
"New York recognizes four exceptions to the general rule that an acquiring corporation is not liable for the liabilities of the acquired corporation: (1) a buyer who formally assumes the seller's debts; (2) a buyer who de facto merged with the seller; (3) transactions undertaken to defraud creditors; and (4) where the buyer may be considered a 'mere continuation' of the seller." Highland Crusader Offshore Partners, L.P. v. Targeted Delivery Techs. Holdings, Ltd., 124 N.Y.S.3d 346 (1st Dept. 2020) (quoting Aguas Lenders Recovery Group v. Suez, S.A., 585 F.3d 696 (2d Cir. 2009)). Plaintiffs allege that Defendant Biogen assumed the debts of Defendant Reata by: (1) unilaterally terminating the Loan Agreement; (2) paying a portion of Defendant Reata's debts owed to Plaintiffs; (3) requesting Plaintiffs to release Plaintiffs' liens under the Loan Agreement; and (4) closing Defendant Reata's securities account which was used to secure the Loan Agreement. NYSCEF Doc. No. 30 at ¶¶ 61—64. Additionally, Plaintiffs' opposition notes that Defendant Reata is nothing more than a shell to protect Defendant Biogen from becoming a successor. NYSCEF Doc. No. 45.
"Traditionally, courts have considered several factors in determining whether a de facto merger has occurred: (1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (4) a continuity of management, personnel, physical location, assets, and general business operation." Sweatland v. Park Corp., 587 N.Y.S.2d 54, 56 (4th Dept. 1992). Defendants contend that Defendant Reata remains an independent corporate entity with a distinct identity from Defendant Biogen. NYSCEF Doc. No. 28 at 24—25. By contrast, Plaintiffs' Complaint alleges that [*11]Defendant Biogen paid off the remainder of Defendant Reata's liabilities to Plaintiffs. NYSCEF Doc. No. 30 at ¶¶ 61—62. Furthermore, it was Defendant Biogen, not Defendant Reata, that terminated the Loan Agreement at issue here and closed Defendant Reata's securities account which secured the Loan Agreement. Id. at ¶¶ 61, 63. Plaintiffs also state that: (1) Defendant Biogen's 10-Q filing noted Skyclarys was listed as an asset in the public filing; (2) Defendant Reata's former web address now redirects to Defendant Biogen's website; and (3) Defendant Biogen removed much, if not all, of Defendant Reata's executives and employees upon acquisition. NYSCEF Doc. No. 45 at 26. Taking the allegations made in Plaintiffs' Complaint as true, Plaintiffs have sufficiently pled that Defendant Biogen is an appropriate party to this suit as a successor of Defendant Reata pursuant to the Loan Agreement or, in the alternative, through a de facto merger. The Court agrees with Plaintiff that, at a minimum, the question of Defendant Biogen's successor liability is a factual issue to be resolved through discovery.
Based on the foregoing, Defendants have failed to establish sufficient cause to dismiss Plaintiffs' Complaint as to any party. Accordingly, it is hereby
ORDERED that Defendants' Motion to Dismiss the Complaint pursuant to CPLR § 3211(a)(7) is denied in its entirety.
DATE September 27, 2024
ANAR RATHOD PATEL, A.J.S.C.

Footnotes

Footnote 1:The facts
are taken from the Complaint and, for the purposes of this motion, are accepted as true.

Footnote 2:Friedreich's ataxia is a degenerative neurological disease that affects physical coordination (among other symptoms and complications) due to degeneration of nerve tissue in the spinal cord. Friedreich Ataxia, https://www.ninds.nih.gov/health-information/disorders/friedreich-ataxia.

Footnote 3:Page numbers to the Loan Agreement (NYSCEF Doc. No. 31) refer to the PDF page number.

Footnote 4:Plaintiffs allege that they requested the revenue to date for September 2023, but that Defendant Reata has refused to provide the exact numbers, opting instead to provide only the projected revenue for the month. Id.

Footnote 5:The Principle of Periodicity requires reporting of revenue to be "divided by standard accounting periods, such as fiscal quarters or fiscal years." James M. Tobin, Generally Accepted Accounting Principles, Accounting.com (June 19, 2024), https://www.accounting.com/resources/gaap/.