Talipot ESG Invs. LLC v Bulltick Fin. Advisory Servs. LLC (2025 NY Slip Op 50349(U))

[*1]

Talipot ESG Invs. LLC v Bulltick Fin. Advisory Servs. LLC

2025 NY Slip Op 50349(U)

Decided on March 19, 2025

Supreme Court, New York County

Chan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 19, 2025
Supreme Court, New York County

Talipot ESG Investments LLC et al., Plaintiffs,

against
Bulltick Financial Advisory Services LLC et al., Defendants.

Index No. 650028/2024

Counsel for Plaintiffs: Robert S. Landy and Amy C. Brown of Ford O'Brien Landy LLP
Counsel for Defendants Bulltick Financial Advisory Services LLC, Hector Villaescusa, Javier Martin Riva, and Adolfo del Cueto: Brian A. Herman and Kyle P. Nodes of Morgan, Lewis & Bockius LLP

Margaret A. Chan, J.

The following e-filed documents, listed by NYSCEF document number (MS004) 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 94, 97 were read on this motion to/for DISMISS .
The following e-filed documents, listed by NYSCEF document number (MS005) 77, 78, 79, 80, 95, 98 were read on this motion to/for DISMISS.
The following e-filed documents, listed by NYSCEF document number (MS006) 81, 82, 83, 84, 85, 96, 99 were read on this motion to/for DISMISS.

Plaintiffs Talipot ESG Investments LLC (Talipot) and Tierra PE LLC (Tierra, and together with Talipot, plaintiffs) bring this action, as amended on May 20, 2024, against defendants Bulltick Financial Advisors Services LLC (Bulltick Financial), Hector Villaescusa, Javier Martin Riva, Adolfo del Cueto, Aithre Capital Management LLC (ACM), and Jamil Swati (collectively, defendants), asserting claims in connection with a purported scheme to convince plaintiffs to invest $20 million in an entity that was on the brink of insolvency (NYSCEF # 50 — Amended Complaint or AC). Presently before the court are three motions: (1) in MS004, defendants Bulltick Financial, Villaescusa, Riva, and del Cueto (the Bulltick Defendants) move to dismiss the Amended Complaint pursuant to CPLR 327 and CPLR 3211(a)(1), (7), and (8) on the grounds of lack of personal jurisdiction, forum non conveniens, and failure to state a claim; [*2](2) in MS005, defendant Swati moves to dismiss the Amended Complaint for failure to state a claim under CPLR 3211(a)(7); and (3) and in MS006, defendant ACM moves to dismiss the Amended Complaint for failure to state a claim under CPLR 3211(a)(7). Plaintiffs oppose each motion. For the following reasons, each of the motions are granted.
BACKGROUND[FN1]
Talipot is a Delaware limited liability company based in California that is wholly owned by Talipot USA LLC, a Delaware limited liability company (AC ¶ 19). Talipot serves as a private investment company for certain Mexico-based investors (see id. ¶¶ 34, 37, 53). Tierra is a Delaware limited liability company based in Delaware that serves as an investment vehicle managed by Grupo Koval (Koval), which is based in Hermosillo, Mexico (id. ¶ 20). The company in which plaintiffs invested, Theia International Group LLC (Theia), was an award-winning Washington D.C.-based technology company that had secured a license from the United States Federal Communications Commission (the Spectrum License) to launch a purportedly revolutionary and cutting-edge satellite system that would be comprised of up to 112 satellites capable of providing real-time, in-depth imaging of the Earth's surface (see id. ¶¶ 2, 6. 28, 44-48; NYSCEF #s 51-52). This action arises from plaintiffs' loss of their $20 million investment following Theia's collapse in 2021 and the subsequent receivership proceedings that concluded in 2023 (see AC ¶¶ 1, 12-18).
The roots of plaintiffs' dispute date back to June 2020 (AC ¶ 49). Specifically, on June 17, 2020, Theia engaged Bulltick Financial to act as its placement agent to solicit investors for an approximately $250 million investment in anticipated operational expenses that Theia would use to test its imaging technology and prepare its facilities for satellite construction (id. ¶¶ 49-50). Around this same time, on June 29, 2020, Theia entered into a Secured Note Purchase and Security Agreement with FCS Advisors LLC d/b/a Brevet Capital Advisors (FCS/Brevet), in order to refinance two separate $100 million promissory notes that Theia had previously owed to FCS/Brevet (the Brevet Notes) (id. ¶ 51).
The ACP Operating Agreement
On October 5, 2020, Bulltick allegedly assisted with the formation of Aithre Capital Partners (ACP) to serve as a special purpose vehicle that would pool investor funds to invest in convertible notes that would be issued by Theia (AC ¶¶ 7, 52). ACP was formed pursuant to an Amended and Restated Limited Liability Company Agreement, dated January 5, 2021 (the ACP Operating Agreement)[FN2]
 (NYSCEF # 66 — Agreement at 1). The primary signatories to the ACP [*3]Operating agreement were ACM, as Sponsor, and non-party Domus Family LLP (Domus), as Managing Member (id. at 39-40). Notably, neither Bulltick nor its partners were ever signatories to the ACP Operating Agreement (see AC ¶ 41; Agreement at 40).
Under Section 3.1 of the ACP Operating Agreement, ACM[FN3]
 was responsible for "the management, administration and control of, and the determination of policies with respect to, [ACP]" (id. § 3.1). ACM, however, "[did] not have any authority to take any actions that constitute the provision of investment advice or any exercise of investment discretion with respect to [ACP]" (id.). ACM also disclaimed "any duty, fiduciary or otherwise, to [ACP] or any Member other than their good faith performance of the administrative obligations" set forth in the ACP Operating Agreement (id. § 3.4). Separately, ACP designated Bulltick as "administrator" for ACP to undertake "certain administrative functions on behalf of [ACM]" (Agreement at 1). Bulltick's role and responsibilities were further delineated in an Administrative Services Agreement (the ASA )entered into with ACP (NYSCEF # 74 — ASA §§ 1.1, 2.1-2.2).
As is relevant here, the ACP Operating Agreement contains a forum selection clause that provided that "any proceeding arising between the parties in any manner pertaining or related to this Agreement shall, to the extent permitted by law, be held in New York County, New York . . . ." (Agreement § 9.14). Bulltick's ASA contains its own separate forum selection clause requiring that disputes be arbitrated before the American Arbitration Association (ASA § 9.3).
Bulltick's Initial Outreach to Plaintiffs Regarding Theia
In September and October 2020, Hector Villaescusa, a Mexico-based partner at Bulltick who also held a seat on Talipot's six-member investment committee, approached both Talipot and Koval on behalf of Bulltick regarding an opportunity to participate in Theia's $250 million capital raise (see AC ¶¶ 21, 56-57, 61-62 68-69 106-108; NYSCEF # 75 — Villaescusa aff ¶ 2). Villaescusa pitched Theia as a revolutionary and disruptive company with proven technology (AC ¶¶ 68, 105-108). In promoting a potential investment, Villaescusa explained that Theia's capital raise would take place through ACP and provide bridge financing to Theia until an additional $2 to $6 billion in committed funding became available, and he emphasized that there was intense interest to participate in this capital raise (id. ¶¶ 64-66). Villaescusa further explained that the plan was for ACP to invest pooled funds into Theia through convertible notes with a 24-month maturity date and an option to convert into equity at a 90% discount (id. ¶ 63).
Following this initial outreach, Villaescusa put Talipot and Koval in touch with Javier Martin Riva, a partner in Bulltick's Alternative Investments Group based in Florida (id. ¶¶ 23, 69, 107; NYSCEF # 76 — Riva aff ¶ 2). From that point on, it is alleged that, on a similar timetable, Theia and Bulltick fraudulently induced plaintiffs to invest in Theia (AC ¶ 66).
[*4]Theia and Bulltick's Inducement of Talipot's Investment
On October 15, 2020, Riva provided Talipot with an overview of the Theia investment and a request to sign a nondisclosure agreement (NDA) for more detailed information (AC ¶¶ 70-71). Following pressure from Riva and Bulltick's Florida-based Chief Executive Officer, Adolfo del Cueto, indicating that Talipot's "window of opportunity" to invest had narrowed and that Talipot must act with "extreme urgency," Talipot agreed to sign the NDA on October 22, 2020 (id. ¶¶ 72-75; NYSCEF # 73 — del Cueto aff ¶ 2). Upon receipt of the NDA, Talipot received a 96-page investor presentation that provided specific details about Theia's satellite program and represented that Theia had either signed or was in negotiations with various government entities that were or would be producing income for Theia (AC ¶ 76; NYSCEF # 53). This included $26 billion in pre-paid income starting in 2021 from various foreign governments (AC ¶ 76; NYSCEF # 53). As alleged, plaintiffs maintain that each of these representations were false (id. ¶ 76).
On November 9, 2020, Talipot attended a presentation about Theia held by Riva, Villaescusa, Theia's CEO, Stephan O'Neill, and Theia's COO, Erland Olsen (the November 9 Presentation) (AC ¶ 77). During the November 9 Presentation, although they disclosed the $200 million FCS/Brevet debt, Theia's executives made multiple misrepresentations about its capital raise plans and its anticipated 2021 revenue (id. ¶¶ 12, 77, 79-80; NYSCEF #s 54-55). As alleged, contrary to Theia's and Bulltick's optimistic representations and projections about Theia's financial health, the reality was that the primary purpose for the capital raise was to pay off the $200 million FCS/Brevet debt (AC ¶ 78). 
After this presentation, Riva circulated a document that falsely indicated that the estimated value of the Spectrum license securing plaintiffs' potential investment was between $6.55 to $10 billion (AC ¶¶ 81, 151; NYSCEF # 57). On November 18, 2020, after considering this information and further representations by Villaescusa that Theia's capital raise would be oversubscribed, Talipot's investment committee ultimately recommended investing in Theia pending the completion of due diligence (AC ¶¶ 82-84). At this point, Talipot began to receive additional documents from Theia and/or Bulltick for its review.
To start, on November 23, 2020, Riva sent Talipot a term sheet between ACP and Theia outlining the terms of ACP's purchase of convertible notes issued by Theia, including its collateralization through the Spectrum License and the anticipated closing date for the capital raise (see AC ¶¶ 85-86). Then, on December 4, 2020, Swati circulated to Talipot a document he purportedly prepared, entitled "201204 Theia Investor Presentation" (id. ¶ 88). There are no allegations about the contents of this presentation.
The next week, on December 10, 2020, Theia, including Swati and other members of the Theia management team, met with Talipot to discuss another document purportedly prepared and circulated by Swati, titled "TGI Management Presentation 201204" (see AC ¶¶ 89, 124). As alleged, the "TGI Management Presentation 201204" (1) reiterated prior misrepresentations that Theia had completed all major contractor agreements and obtained all funding required to build and launch its satellite system, and (2) contained a "fake capitalization table" to portray the project as well-funded (id. ¶ 89). Finally, on December 13, 2020, Riva sent Talipot a membership subscription document for ACP and indicated that Bulltick would be "imminently" receiving and closing on investor commitments (id. ¶ 92). Plaintiffs contend that each of these documents were circulated to induce Talipot's investment despite the fact that no other investors [*5]were planning to participate in this capital raise (see id. ¶¶ 88-89, 93)
As Talipot received these materials, its concerns about its ability conduct proper due diligence were repeatedly dismissed or downplayed by Bulltick. For instance, on December 3, 2020, Talipot, through its CEO Gabriel Terrazas, communicated its concerns to del Cueto about Talipot's ability to conduct extensive "good legal due diligence" ahead of the December closing date (AC ¶¶ 86-87). In response, del Cueto purportedly emphasized the due diligence that Bulltick had already conducted to assuage Talipot's concerns (see id. ¶ 87). Later, on December 10, 2020, when Talipot again expressed concern that it had been unable to conduct full due diligence, Riva circulated a due diligence package put together by Theia, Bulltick, ACM, and outside counsel for Theia and Bulltick, DLA Piper (id. ¶ 90). And on December 14, 2020, when Talipot commented on the deal's rushed timeframe, Riva reiterated that the transaction had to close by year's end, reaffirmed that Bulltick had carried out "exhaustive" due diligence, and represented that, due to the "very high" investment demand, he needed Talipot to make a "soft commitment" to avoid being omitted from the capital-raise allocation (id. ¶¶ 95, 99; NYSCEF # 56). In response, on December 18, 2020, Talipot executed a non-binding soft commitment letter (see AC ¶ 99).
On December 28, 2020, Talipot's outside counsel, Perkins Coie, received from DLA Piper a copy of the Secured Note Purchase Agreement (SNPA), which represented that the convertible notes to be issued by Theia to ACP would be secured by 100% of common stock of non-party Theia Holdings Inc. and the Spectrum License (now valued at $2.67 billion) (AC ¶¶ 100-101). Based on Theia's and Bulltick's various representations over the prior few months, Talipot believed that it was receiving an indirect interest in both the equity of Theia and its investment was secured by collateral (i.e., the Spectrum License) that exceeded the value of any debt owed by Theia under the Brevet Notes (see id. ¶ 101). Thus, on January 5, 2021, Talipot signed the subscription agreement to invest in ACP, and on January 6, 2025, it fully funded it $15 million investment into ACP (id. ¶¶ 102-104).
Theia and Bulltick's Inducement of Tierra's Investment
Theia and Bulltick allegedly engaged in a similar pattern of conduct with Tierra. Specifically, on October 22, 2020, after Villaescusa's initial outreach and introduction, Riva circulated a draft NDA to Tierra's investment manager, Koval (AC ¶ 109). Koval returned a signed copy on October 26, 2020, and on November 2, 2020, it received a hard copy of Theia's investor presentation (id.). It was around this time that Riva communicated to Koval that Bulltick's conversations with investors for private placement were "advanced" and that a number of investors had shown interest in Theia's capital raise (see id. ¶ 110).
On November 17, 2020, Koval participated in a video call with Riva and other members of Theia's management team, during and after which Riva and Theia made representations about Theia's capitalization, its business model and valuation, its contemplated $250 million capital raise, and the Spectrum License (see AC ¶¶ 111-113). On November 25, 2020, when Koval inquired about the relationship between ACP and Bulltick, Riva represented that Bulltick was responsible for "the placement of th[e] private note among its clients" in Latin America (id. ¶ 114). In that same correspondence, Riva also purportedly represented that Theia had signed binding commitments for $18.5 billion, with $6 million deposited in escrow (id. ¶ 116). Plaintiffs maintain that all of these representations were false (see id. ¶¶ 115-116).
On December 13, 2020, Riva circulated subscription documents to Koval and, as he did with Talipot, he communicated that Koval had to operate under a tight schedule because the capital raise was closing by year's end (see AC ¶ 121). On December 18, 2020, a few days after Koval expressed concern with the timeline, Riva assured Koval that he would connect it with DLA Piper to answer any outstanding questions in connection with a due diligence review (id. ¶¶ 121-122). That same day, Swati sent the same "TGI Management Presentation 201204" document that had been circulated to Talipot (see id. ¶¶ 123-124).
On December 18, 2020, Koval approved a $5 million investment in ACP on behalf of Tierra (AC ¶ 125). Three days later, on December 21, 2020, Swati organized a meeting among Koval, Bulltick, and Theia (id. ¶ 126). Although plaintiffs allege that del Cueto, Riva, and Swati all participated in this meeting, they do not specify what they discussed with Koval (see id.). Later, on December 29, 2020, Riva circulated subscription documents to Koval, and on January 4, 2021, the subscription agreement was executed on behalf of Tierra (id. ¶¶ 127-128). By January 7, 2021, Tierra had fully funded its $5 million to ACP (id. ¶ 129).
Theia's Default and Subsequent Receivership
As Theia and Bulltick solicited plaintiffs' investments, Theia was entering into a liquidity crisis that forced it to restructure its short-term debt obligations to FCS/Brevet so as to avoid an immediate default (see AC ¶ 97). None of these issues were disclosed to plaintiffs during their respective due diligence periods (see id. ¶¶ 98, 123). Later, after plaintiffs had funded their investments, Theia and Bulltick continued to mask Theia's financial struggles and its looming default on the Brevet Notes (see id. ¶¶ 131-134).
On April 19, 2021, FCS/Brevet delivered a Notice of Default to Theia based on its failure to develop a liquidity plan, appoint a Chief Restructuring Officer, and provide financial reporting (AC ¶ 136). FCS/Brevet also contended that the SNPA violated the terms of the Brevet Notes (id.). Later, on July 28, 2021, FCS/Brevet delivered a Second Notice of Default to Theia (id. ¶ 144). Neither Theia, Bulltick, nor ACP disclosed these Notice of Default; instead Bulltick continued to promote further investment opportunities through emails and various meetings in Miami and Washington D.C. (see id. ¶¶ 137-143, 145-147).
On August 19, 2021, FCS/Brevet commenced an action against Theia in the United States District Court for the Southern District of New York seeking the appointment of a receiver (the SDNY Action) (AC ¶ 148). In addition to bringing claims related to Theia's default on the Brevet Notes, FCS/Brevet alleged that Theia had engaged in fraud (id.). In response to this lawsuit, Villaescusa assured representatives of both Talipot and Koval that the Spectrum License securing their investments was worth billions of dollars, meaning that Talipot and Koval would be able to recoup their investments upon the appointment of a receiver (id. ¶¶ 149, 151). A receiver was formally put into place on November 8, 2021 (id. ¶ 150).
Ultimately, contrary to Theia's and Bulltick's representations, the Spectrum License was never, in fact, an adequate protection of plaintiffs' investments (see AC ¶¶ 149, 151, 154). Specifically, on August 12, 2023, after it failed to successfully sell the Spectrum License, the receiver filed a motion to sell all of Theia's assets for $40 million in total (id. ¶¶ 152-155). The court in the SDNY Action "reluctantly" granted the receiver's motion on October 23, 2023, approving a sale to an affiliate of FCS/Brevet (id. ¶ 155).
[*6]Procedural Posture
Plaintiffs initially commenced this action on January 3, 2024, asserting causes of action for (1) common law fraud against Bulltick, del Cueto, Martin, Villaescusa, and Swati, (2) aiding and abetting fraud against Bulltick, del Cueto, Martin, Villaescusa, and Swati, (3) unjust enrichment against ACM, Bulltick, and Villaescusa, and (4) breach of fiduciary duty and imposition of constructive trust against ACM, Bulltick, and Villaescusa (NYSCEF # 1).[FN4]
 After defendants moved to dismiss the original complaint (see NYSCEF #s 20, 36, 40), plaintiffs filed the Amended Complaint on May 20, 2024 (see NYSCEF # 50).
Beyond adding additional factual allegations, the Amended Complaint added a cause of action for gross negligence against defendants Bulltick, del Cueto, Riva, and Villaescusa and added ACM to its claims for common law fraud, aiding and abetting fraud, and breach of fiduciary duty (see AC ¶¶ 158, 166-169). Defendants again all responded by moving to dismiss (NYSCEF #s 62, 77, 81).
DISCUSSION
CPLR 3211(a) provides for various grounds under which a party may move to dismiss one or more causes of action. Under CPLR 3211(a)(8), a party may move to dismiss on the ground that the court lacks personal jurisdiction over defendants (CPLR 3211 [a] [8]). On such a motion, the court is required to accept as true allegations set forth in the complaint and accord plaintiff the benefit of every possible favorable inference (see Leon v Martinez, 84 NY2d 83, 87-88 [1994]; Lawati v Montague Morgan Slade Ltd., 102 AD3d 427, 428 [1st Dept 2013]; Whitcraft v Runyon, 123 AD3d 811, 812 [2d Dept 2014]). The plaintiff nevertheless bears the "burden of presenting sufficient evidence, through affidavits and relevant documents, to demonstrate jurisdiction" (Coast to Coast Energy, Inc. v Gasarch, 149 AD3d 485, 486 [1st Dept 2017]). Although plaintiff need not conclusively establish that there is personal jurisdiction in defending against a motion to dismiss, he or she must make at least a "'sufficient start' in demonstrating, prima facie, the existence of personal jurisdiction" (see Matter of James v iFlex Inc., 185 AD3d 22, 29-30 [1st Dept 2020]).
Next, under CPLR 3211(a)(7), a party may seek dismissal when a pleading "fails to state a cause of action." On a motion brought pursuant to CPLR 3211(a)(7), the court "must accept as true the facts as alleged in the complaint and submissions in opposition to the motion" and "accord plaintiffs the benefit of every possible favorable inference" (Whitebox Concentrated Convertible Arbitrage Partners, L.P. v Superior Well Servs., Inc., 20 NY3d 59, 63 [2012]). Courts will test the facial sufficiency of a pleading, assessing whether plaintiff has "stated a claim cognizable at law" or, if the claim is cognizable, whether plaintiff has "failed to assert a material allegation necessary to support the cause of action" (see Basis Yield Alpha Fund (Master) v Goldman Sachs Group, Inc., 115 AD3d 128, 135 [1st Dept 2014]). "Whether a plaintiff can ultimately establish its allegations" is not considered when determining a motion to dismiss under CPLR 3211(a)(7) (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]).
By contrast, on a motion brought pursuant to CPLR 3211(a)(1), a party may move for [*7]judgment dismissing one or more causes of action asserted against it on the ground that "a defense is founded upon documentary evidence." A motion to dismiss on this basis will be granted only where the documentary evidence "utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law (Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314, 326 [2002]; Amsterdam Hospitality Group, LLC v Marshall-Alan Assoc., Inc., 120 AD3d 431, 433 [1st Dept 2014]). When such documentary evidence is submitted in support of a motion to dismiss, "the standard morphs from whether the plaintiff stated a cause of action to whether it has one" (Basis Yield Alpha Fund, 115 AD3d at 135).
DISCUSSION
Pending before the court are three motions to dismiss. In MS004, Bulltick, Villaescusa, Riva, and del Cueto (the Bulltick Defendants) seek dismissal of the claims against them on the grounds that (i) the court lacks personal jurisdiction, (ii) New York is not a proper forum for this dispute under the doctrine of forum non conveniens, and (iii) at any rate, plaintiffs fail to state a claim for relief (NYSCEF # 63 — Bulltick MOL at 7-23; NYSCEF # 97 — Reply at 5-13). In MS005, Swati moves to dismiss on the grounds that plaintiffs have failed to state claims for fraud, aiding and abetting fraud, and breach of fiduciary duty against him (NYSCEF # 80 — Swati MOL at 15-22; NYSCEF # 98 — Swati Reply at 1-6). And in MS006, ACM moves to dismiss on the grounds that plaintiffs have failed to state claims for fraud, aiding and abetting fraud, breach of fiduciary duty, and unjust enrichment against it (NYSCEF # 85 — ACM MOL at 9-21; NYSCEF # 99 — ACM Reply at 1-6). MS004 will be considered first followed by MS005 and MS006.
I. The Bulltick Defendants' Motion to Dismiss (MS004)
The primary basis for the Bulltick Defendants' motion to dismiss is that the court lacks personal jurisdiction over them (see Bulltick MOL at 8-11; Bulltick Reply at 1-6). In opposition, plaintiffs essentially concede that none of the Bulltick Defendants' allegedly wrongful conduct took place in or was directed toward New York (see NYSCEF # 94 — Pltf's Bulltick Opp at 8-11; see also Villaescusa aff ¶ 2; Riva aff ¶ 2; del Cueto aff ¶ 2). Plaintiffs nonetheless contend that the ACP Operating Agreement's forum selection clause is binding on the Bulltick Defendants and thus dispositive of the issue of jurisdiction (Pltf's Bulltick Opp at 8-9).
In general, forum selection clauses "provide certainty and predictability in the resolution of disputes" (See Brooke Group Ltd. v JCH Syndicate 488, 87 NY2d 530, 534 [1996]). For this reason, it is the "well-settled 'policy of the courts of [New York] to enforce contractual provisions for . . . selection of a forum for litigation" (Sterling Natl. Bank as Assignee of NorVergence, Inc. v E. Shipping Worldwide, Inc., 35 AD3d 222, 222 [1st Dept 2006], quoting Koob v IDS Fin. Servs., 213 AD2d 26, 33 [1st Dept 1995]). Forum selection clauses confer personal jurisdiction over all parties to the agreement containing such a provision (see Natl. Union Fire Ins. Co. of Pittsburgh, Pa. v Williams, 223 AD2d 395, 397-398 [1st Dept 1996] ["It is settled that a selection of forum clause affords a sound basis for the exercise of personal jurisdiction over a foreign defendant"]).
In the instant matter, all parties agree that the ACP Operating Agreement requires that "any proceeding arising between the parties in any manner pertaining or related to this Agreement shall, to the extent permitted by law, be held in New York County, New York . . . ." (Agreement § 9.14; see also AC ¶ 39). The problem, however, is that none of the Bulltick Defendants are parties to the ACP Operating Agreement (see AC ¶ 41; see also Agreement at 39-58). To get around this issue, plaintiffs allege that the ACP Operating Agreement's forum [*8]selection clause binds the Bulltick Defendants because they are closely related to the ACP Operating Agreement's signatories (Pltf's Bulltick Opp at 9; AC ¶¶ 41-43).
The general rule in New York is that only parties to an agreement will be bound by its terms (see Tate & Lyle Ingredients Am., Inc. v Whitefox Techs. USA, Inc., 98 AD3d 401, 401 [1st Dept 2012]). Accordingly, "unless a recognized exception applies, . . . 'a forum selection clause may not be enforced against a nonsignatory'" (Sherrod v Mount Sinai St. Luke's, 204 AD3d 1053, 1056 [2d Dept 2022]; accord Lantau Holdings Ltd. v Orient Equal Intl. Group Ltd., 161 AD3d 714, 714 [1st Dept 2018] [recognizing the "general rule that a forum selection clause may not be enforced against a nonsignatory applies to it" absent an exception]).
One such recognized exception under New York law exists when a non-signatory is "closely related" to a signatory to the contract (Freeford Ltd. v Pendleton, 53 AD3d 32, 39-40 [1st Dept 2008]). Specifically, "[u]nder New York law, a signatory to a contract may invoke a forum selection clause against a non-signatory if the non-signatory is 'closely related' to one of the signatories such that 'enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound'" (see Metro-Goldwyn-Mayer Studios Inc. v Canal+ Distrib. S.A.S., 2010 WL 537583, at *5 [SD NY, Feb. 9, 2010, No. 07 Civ. 2918(DAB)]). A close relationship between a nonsignatory and a signatory exists "[i]f the nonsignatory party has an ownership interest or a direct or indirect controlling interest in the signing party," or if "the entities or individuals consulted with each other regarding decisions and were intimately involved in the decision-making process" of the signatory (see Universal Inv. Advisory SA v Bakrie Telecom Pte., Ltd., 154 AD3d 171, 179 [1st Dept 2017] [citations omitted]; see also Tate & Lyle, 98 AD3d at 403 [finding that forum selection clause applied to nonsignatory defendant that was "intimately involved in" the signatory entity's decision-making process in connection with a licensing agreement]). Put differently, "[a] non-party is 'closely related' to a dispute if its interests are 'completely derivative' of and 'directly related to, if not predicated upon' the signatory party's interests or conduct" (Cfirstclass Corp. v Silverjet PLC, 560 F Supp 2d 324, 328 [SD NY 2008]). This is a "fairly strict standard" (see Miller v Mercuria Energy Trading, Inc., 291 F Supp 3d 509, 523 [SD NY 2018]).
At the outset, plaintiffs do not seriously contend that any of the Bulltick Defendants maintain either an ownership interest or a direct or controlling interest in any of the entities that were signatories to the ACP Agreement. Nor could they. Bulltick's entire role in the transaction, as detailed in the Amended Complaint, was to act a placement agent for Theia and serve as the administrator for ACP (see AC ¶¶ 21, 68-129). Plaintiffs instead maintain that a close relationship exists between the Bulltick Defendants and the ACP Operating Agreement's signatories because, as alleged, the Bulltick Defendants purportedly (1) induced plaintiffs to sign the ACP Operating Agreement, (2) were instrumental in forming ACP as an investment vehicle for plaintiffs to invest in Theia, and (3) circulated relevant investment documents to plaintiffs that were prepared by its outside counsel (see AC ¶¶ 40-42; Pltf's Bulltick Opp at 9-10, citing AC ¶¶ 7, 52, 85, 92, 100, 120, 127). These allegations, however, only establish that the Bulltick Defendants worked with Theia and ACP to induce the investments from plaintiffs they were hired to facilitate. They do not, as plaintiffs suggest, establish that the Bulltick Defendants' interests were "completely derivative of" or "directly related to" ACP Operating Agreement's signatories' interest so as to now be bound the forum designated under the agreement.
The federal court's decision in Leviton Mfg. Co. v Reeve (942 F Supp 2d 244, 258 [ED NY 2013]) is instructive. In Leviton, plaintiff had argued that the court could exercise personal [*9]jurisdiction over a defendant attorney and his law firm based on a choice of forum provision in a stock purchase agreement that defendants induced plaintiff to sign (id. at 255). Plaintiff maintained that, by providing an opinion letter "pursuant to" the agreement, the defendant attorney and his law firm "consented to this choice of forum provision and accordingly th[e] [c]ourt's jurisdiction" (id.). The district court disagreed. In so holding, the court first acknowledged that, "[p]ractically speaking, [the defendant attorney] is arguably 'closely related' to the signatories in that he was acting as [their] counsel . . . for the purpose of the relevant transaction" and had "draft[ed] and deliver[ed] [] an Opinion Letter pursuant to that [a]greement" (id. at 258). The court, however, determined that neither the attorney nor his law firm were "sufficiently 'closely related' so that enforcement of the forum selection clause was foreseeable by virtue of the relationship" with the agreement's signatories (id. at 258-259 [emphasis added]). Specifically, the court determined that the circumstances underlying plaintiff's claim—i.e., the provision of due diligence and the rendering of an opinion regarding the stock purchase agreement—were "too attenuated" to bind the attorney defendants to the stock purchase agreement's forum selection clause (id. at 259). That was because, the court continued, "[t]he vast majority of cases that have found a nonsignatory bound by a forum selection clause under the theory that they are 'closely related' to the dispute or the signatory, have done so where the non-signatory had a far more active role in the transaction, or where the non-signatory had an active role in the company that was the signatory" (id. [citations omitted]).[FN5]

The same reasoning applies here. As explained, the primary basis upon which plaintiffs attempt to bind the Bulltick Defendants to the ACP Operating Agreement's forum selection clause is that Bulltick engaged in certain conduct in its capacity as placement agent and administrator that, in conjunction with Theia's own representations and conduct, ultimately convinced plaintiffs to invest in Theia's capital raise through ACP. This included drafting the agreement the ACP Operating Agreement, assisting with the formation of this entity, and circulating relevant transaction documents to facilitate plaintiffs' subscription (see AC ¶¶ 7, 40-42, 52, 85, 92, 100, 120, 127). But like in Leviton, even if these facts show that Bulltick had a "close" transactional relationship with Theia, ACP, and ACM that influenced plaintiffs' investment, it does not follow that, given their overall role, the Bulltick Defendants would have contemplated being bound to the ACP Operating Agreement's forum selection clause to litigate claims arising out of the Theia transaction.
This conclusion is only buttressed by the ASA between ACP and Bulltick. For example, Bulltick's obligations on behalf of ACP under the ASA—which included distributing information to members of ACP, circulating notices between ACP from its members, and coordinating tax and financial information—were generally administrative in nature (ASA [*10]§ 1.1). Furthermore, the ASA had its own separate forum selection clause that required that the parties agreed to resolve arising out of Bulltick's provision of work under the ASA "by final and binding arbitration to be conducted by an arbitration tribunal in Miami, Florida" (id. § 9.3). Accounting for these contractual provisions, and again considering Bulltick's overall role in Theia's capital raise, the present record plainly does not evince the requisite level of intimate control, involvement, or relation between the Bulltick Defendants and ACP, Theia, or ACM, that would have made it foreseeable that the Bulltick Defendants would be litigating disputes arising out of an agreement they had not signed.
Plaintiffs' reliance on Highland Crusader Offshore Partners, L.P. v Targeted Delivery Techs. Holdings, Ltd. (184 AD3d 116 [1st Dept 2020]) does not compel a different conclusion. In Highland Crusader, plaintiffs were the majority holders of $156 million in secured notes issued by a nonparty that was, in turn, guaranteed by various entities, including defendant Targeted Delivery Technologies Holdings (TDTH) (184 AD3d at 118). The notes' indenture under which plaintiff had sued included a forum selection clause that selected New York as the relevant forum for resolving disputes, but TDTH had not signed this agreement (see id. at 119-120). Eventually, the notes were defaulted on, and plaintiffs commenced suit in New York state court, alleging that the court had jurisdiction over TDTH under the indenture's forum selection clause because it was closely related to the signatories of the relevant agreements (id. at 120-121). TDTH (and other defendants) moved to dismiss for lack of personal jurisdiction, but the trial court denied the motion under the "closely related" doctrine (id. at 121).
On appeal, the First Department affirmed (184 AD3d at 124). In so holding, the First Department observed that, although TDTH did not execute the indenture, its subsidiary, Targeted Delivery Technologies (TDT), did execute it (id. at 124). Further, the indenture referenced TDTH throughout and incorporated a subscription agreement between the notes' issuer and TDTH as part of its terms (id.). Given these facts, First Department concluded that "enforcement of the forum selection clause against TDTH was foreseeable by virtue of TDTH's ownership interest in and control over TDT and its involvement in the notes offering" (which, of course, included its role as a guarantor of the notes) (id.). Here, by contrast, Bulltick is neither a subsidiary/owner of any of the signatories to the ACP Operating Agreement, nor does it otherwise maintain any direct or indirect control over them. And there is otherwise no indication that the Bulltick Defendants were so closely involved with any of the ACP Operating Agreement's signatories as to conclude that it would be "contrary to public policy to allow [them] . . . to evade the forum selection clause (cf. id. at 122; see also ASA §§ 1.1, 2.1, 9.3).
The other cases cited by plaintiffs are similarly distinguishable. Indeed, they all involved situations in which the nonsignatory to the relevant agreement was essentially a controlling agent that could act on behalf of the signatory or otherwise exert control over it (cf. e.g. Nanopierce Tech., Inc. v Southridge Cap. Mgt. LLC, 2003 WL 22882137, at * 6 [SD NY, Dec. 4, 2003, No. 02 Civ. 0767(LBS)] [non-signatory was bound to forum selection clause because the non-signatory was the Chief Financial Officer of the signatory of at-issue purchase agreement]; Universal Inv. Advisory, 154 AD3d at 179 [ordering jurisdictional discovery regarding whether non-signatories were "closely related" to signing parties because plaintiffs had alleged that individual defendants held "senior management positions, power and decision-making authority" over signatory company and had a significant role in authorizing, participating, and promoting certain note offerings to the market]; Suttongate Holdings Ltd. v Laconm Mgt. N.V., 160 AD3d 464, 464 [1st Dept 2018] [holding that the court could exert personal jurisdiction based on forum [*11]selection clause over nonsignatory to the agreement because ther was "proof . . . that [counterclaim defendant] stat[ed] he was in a joint venture with some of the" signatories and had "control of the corporate documents of those companies"]). In the present dispute, however, there is no suggestion that any of the Bulltick Defendants had a similar degree of control or authority over the ACP Operating Agreement's signatories.
In sum, because there is no basis to conclude that this court has personal jurisdiction over them, the Bulltick Defendants' motion to dismiss is granted.[FN6]

II. Swati's and ACM's Motions to Dismiss (MS005 + M006)
The Amended Complaint asserts three claims against Swati: (1) common law fraud, (2) aiding and abetting fraud, and (3) breach of fiduciary duty (AC ¶¶ 158, 160-165, 173-180). The Amended Complaint also asserts four claims against ACM: (1) common law fraud, (2) aiding and abetting fraud, (3) breach of fiduciary duty, and (4) unjust enrichment (AC ¶¶ 158, 160-165, 170-180). Neither Swati nor ACM seek dismissal of the Amended Complaint on personal jurisdiction grounds. Instead, both move to dismiss the claims alleged against them on the grounds that plaintiffs have failed to state any claims against them. Each of their challenges are addressed in turn.
A. Common Law Fraud
Swati asserts that, beyond alleging that he was at a few meetings and prepared certain presentations, plaintiffs have failed to allege what, if anything, Swati materially misrepresented to plaintiffs or knowingly omitted from them (Swati MOL at 15-17; Swati Reply at 2-4). Meanwhile, ACM contends that dismissal of plaintiffs' common law fraud claims is warranted here because they have failed to establish that any of the actions associated with Swati can be imputed to ACM and, in any event, plaintiffs have failed to sufficiently plead a fraud claim against Swati (see ACM MOL at 20-21).
Plaintiffs respond by asserting that they adequately alleged that Swati prepared and circulated presentations that were replete with material misrepresentations, and he also had an obligation to disclose material facts to plaintiffs during the meetings he attended (NYSCEF # 96 — Pltf's Swati Opp at 9-10). As for ACM, plaintiffs aver that there is no law that relieves a management company from liability for fraud simply because it did not have much to manage, and, in this case, ACM had broad power and authority to serve as the manager of ACP (NYSCEF # 95 — Pltf's ACM Opp at 9-10). Plaintiffs separately assert that Swati's fraudulent actions can be imputed on ACM given that he had managerial responsibility over ACM (id. at 10).
To state a claim for common-law fraud, a complaint must allege a representation or omission of a material fact, falsity, scienter, reliance, and injury (see Albert Apt. Corp. v Corbo Co., 182 AD2d 500, 500 [1st Dept 1992]). And if a fraud claim is predicated on acts of concealment, plaintiffs must also allege that "defendant had a duty to disclose material [*12]information and that it failed to do so" (P.T. Bank Cent. Asia, NY Branch v ABN AMRO Bank N.V., 301 AD2d 373, 376 [1st Dept 2003]). Such a duty arises "under the 'special facts' doctrine where 'one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair'" (Jana L. v. W. 129th St. Realty Corp., 22 AD3d 274, 277 [1st Dept 2005]).
In all cases, fraud-based claims must satisfy the "more stringent" pleading requirements of CPLR 3016(b), which requires that "circumstances constituting the wrong shall be stated in detail" (Swersky v Dreyer and Traub, 219 AD2d 321, 326 [1st Dept 1996], citing Ambassador Factors v Kandel & Co., 215 AD2d 305, 307-308 [1st Dept 1995]). This requires allegations of "specific facts with respect to the time, place, or manner of th[e] purported misrepresentation" (see CMB Export Infrastructure Inv. Group 48, LP v Motcomb Estates, Ltd, 223 AD3d 513, 514 [1st Dept 2024]). Although this pleading requirement should "not be confused with [requiring] unassailable proof of fraud," the facts alleged still must be "sufficient to permit a reasonable inference of the alleged conduct" (see Pludeman v N. Leasing Sys., Inc., 10 NY3d 486, 492 [2008])
At the outset, it is evident from that plaintiffs' common law fraud claim against Swati is asserted largely by virtue of his association with Theia (see AC ¶¶ 157-158, 164). In fact, although Swati is named as a defendant for purposes of plaintiffs' common law fraud claim, plaintiffs fail to allege any conduct specifically attributable him in their recitation of the claim (see id. ¶ 158). But even upon considering all of the allegations referencing Swati in the Amended Complaint, plaintiffs have plainly failed to sufficiently plead a fraud claim against him.
In essence, plaintiffs point to four distinct actions by Swati to purportedly establish that he induced plaintiffs' investment in Theia. To start, on December 4, 2020, Swati circulated to Talipot a "link to a document entitled '201204 Theia Investor Presentation'" containing unspecified "substantial falsehoods" that he allegedly prepared and edited (id. ¶ 88). Then, on December 10, 2020, Swati circulated a document he allegedly prepared and edit, titled "TGI Management Presentation 201204," that reiterated various falsehoods, and soon after Swati, along with "other members of the Theia management team," reviewed this presentation with Talipot (id. ¶¶ 89, 124). About a week later, on December 18, 2024, Swati circulated the same "TGI Management Presentation 201204" to Tierra's representatives (id. ¶ 123). And finally, on December 21, 2020, Swati organized and attended a Microsoft Teams meeting with plaintiffs (id. ¶ 126).
These allegations ultimately fail to state a claim for fraud against Swati for three reasons. First, beyond vague allegations made upon information and belief concerning Swati's preparation and circulation of the materials that contained Theia's purported falsehoods, there are no allegations, stated with sufficiently particularity, that Swati was responsible for these statements or aware—even by inference—that the statements were false.[FN7]
 This is particularly problematic from a pleading perspective where, as the Amended Complaint acknowledges, the presentations circulated by Swati largely "reiterated" prior falsehoods communicated by other Theia and Bulltick representatives (AC ¶¶ 89, 123). Second, the Amended Complaint is devoid of any allegations suggesting that, during the meetings he attended, Swati personally [*13]communicated or reiterated any false statements to plaintiffs. Finally, although they only assert this contention for the first time in opposition (see Pltf's Swati Opp at 10), plaintiffs failed to plead any allegations with sufficiently particularity to support even a reasonable inference that, to the extent he was aware, Swati had a duty to disclose either Theia's financial condition or the looming default on the Brevet Notes.
At bottom, plaintiffs' claim against Swati is what can most charitably be described as fraud by association with Theia (see AC ¶ 158 [citing various instances of fraudulent conduct attributable to "Theia, via its CEO Stephen O'Neill and COO Erend Olson"]). But such allegations are ultimately tantamount to improper group that is insufficient under CPLR 3016(b) (see e.g. Barlow v Skroupa, 76 Misc 3d 587, 591 [Sup Ct, NY County, 2022], quoting Principia Partners LLC v Swap Fin. Group, LLC, 194 AD3d 584, 584 [1st Dept 2021] ["The failure to distinguish among the various defendants regarding which misrepresentations and omissions each defendant made to each plaintiff, when, and where is 'improper group pleading'"]). Without more, plaintiffs' common law fraud claim against Swati must be dismissed.
Dismissal is even more warranted with respect to plaintiffs' common law fraud claim against ACM. Indeed, beyond identifying ACM as the manager of ACP, plaintiffs fail to identify a single misrepresentation or omission that is specifically attributable to ACM that would even meet the threshold pleading requirement of CPLR 3013, let alone CPLR 3016(b) (see Murphy v Kozlowska, 217 AD3d 455, 455 [1st Dept 2023] [affirming dismissal of fraud-based claim as insufficiently pleaded "because they do not identify any misrepresentation made by defendants"]). Separately, insofar as plaintiffs attempt to rely on Swati's conduct to impute misconduct on the part ACM, the Amended Complaint fails to plausibly allege any basis to conclude that Swati's alleged misrepresentations and omissions arose from his capacity as an owner of ACM, as opposed to his role at Theia (see generally AC ¶¶ 88-89, 123-124, 126). At any rate, even if Swati's conduct was attributable to ACM, for the reasons explained above, plaintiffs have failed to allege with sufficient particularity a claim for fraud against Swati.
In sum, the motions to dismiss plaintiffs' claims of common law fraud against Swati and ACM are granted.
B. Aiding and Abetting Fraud
Attacking plaintiffs' aiding and abetting fraud claim, both ACM and Swati contend that, outside of alleging that Swati prepared certain presentations, plaintiffs have failed to sufficiently allege with particularity how Swati or ACM substantially assisted in the achievement of Theia's fraud (Swati MOL at 16-17; Swati Reply at 4-5; ACM MOL at 20-21). Plaintiffs, in opposition, counter that Swati, as Theia's Head of Strategic Investments and a half-owner of ACM, necessarily knew of the ongoing fraud (Pltf's Swati Opp at 13). Furthermore, plaintiffs maintain that, by alleging that Swati prepared and disseminated documents, they have sufficiently alleged "substantial assistance" (id.). As for ACM, plaintiffs maintain that they have sufficiently alleged substantial assistance by ACM to maintain its aiding and abetting claim against it (Pltf's ACM Opp at 13).
To plead a claim for aiding and abetting fraud, the complaint must allege: "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud" (see Stanfield Offshore Leveraged Assets, Ltd. v Metro. Life Ins. Co., 64 AD3d 472, 476 [1st Dept 2009]). "Substantial assistance exists 'where (1) a defendant affirmatively assists, helps conceal, or by [*14]virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated'" (id. quoting UniCredito Italiano Spa v JPMorgan Chase Bank, 288 F Supp 2d 485, 502 [SD NY 2003]). Put differently, when assessing the sufficiency of an aiding and abetting claim, courts should determine whether the defendant's actions made "a 'substantial contribution' to the fraud" (see In re Kingdom of Belgium, Fed. Public Serv. Fin. Pension Plan Litig., 680 F Supp 3d 460, 477 [SD NY 2023] [holding that plaintiff sufficiently pleaded claim for aiding and abetting fraud where defendant's assistance "formed an essential part of the fraudulent scheme").
Here, the crux of plaintiffs' aiding and abetting claim against Swati and ACM (apparently by virtue of Swati's ownership interest) is that they "substantially assisted Theia's fraud by preparing and disseminating the Theia presentations containing false statements" (AC ¶ 164). But assuming, without deciding, that plaintiffs have alleged the existence of an underlying fraud and that Swati's conduct can be attributed to ACM, there is no basis to conclude from the Amended Complaint that Swati's preparation, editing, and dissemination of either the 201204 Theia Investor Presentation'" or the "TGI Management Presentation 201204" substantially contributed to this alleged fraud so as to form an essential part of it (cf. William Doyle Galleries, Inc. v Stettner, 167 AD3d 501, 504 [1st Dept 2018] [substantial assistance sufficiently pleaded where plaintiff alleged "[b]ut for the verbal assurances by HSBC Vice President Caban and the HSBC Letter vouching for Stettner's financial and personal integrity, Stettner's scheme would have failed. Doyle released the Valuables only after HSBC's repeated representation . . ."]). In fact, accepting its allegations as true, the Amended Complaint is replete with various alleged misrepresentations and omissions attributable to other defendants and non-parties that, by plaintiffs' own account, appear to have been far more consequential to inducing plaintiffs' investment in Theia as opposed to the four discrete actions taken by Swati (see generally AC ¶¶ 49-60, 61-87, 90-104, 105-122, 125-129, 157-159).[FN8]

As a result, dismissal of plaintiffs' aiding and abetting claim as asserted against Swati and ACM is warranted and the claim is dismissed against them.
C. Breach of Fiduciary Duty
In seeking dismissal of plaintiffs' breach of fiduciary duty claim, Swati maintains that plaintiffs have failed to plead any facts establishing that Swati owed a fiduciary duty to plaintiffs or that, even if he did, he breached that duty (Swati MOL at 21; Swati Reply at 5-6). ACM, by contrast, argues that the Amended Complaint fails to state claim for breach of fiduciary duty for two reasons. First, the ACP Operating Agreement explicitly disclaimed any fiduciary duties owed to plaintiffs beyond the good faith performance of administrative obligations (ACP MOL [*15]at 18; ACP Reply at 3-4). Second, plaintiffs have failed to plead any facts establishing that ACM breached any purported duty owed (ACP MOL at 18-19).
Plaintiffs retort that, because Swati owned half of ACM, which was the manager of ACP, he in turn owed a fiduciary duty to plaintiffs (Swati Opp at 15-16). And as for ACM, plaintiffs aver that, even if ACM waived fiduciary duties, it nevertheless owed fiduciary duties as "co-manager" of ACM (Pltf's ACM Opp at 14). At any rate, plaintiffs continue, Swati's conduct can be imputed to ACM and, as alleged, Swati engaged in conduct that breached fiduciary duties owed to plaintiffs (id. at 14-15).
It is well settled that "[t]o state a claim for breach of fiduciary duty, plaintiffs must allege that (1) defendant owed them a fiduciary duty, (2) defendant committed misconduct, and (3) they suffered damages caused by that misconduct" (Besen v Farhadian, 195 AD3d 548, 549 [1st Dept 2021]). A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation" (EBC I, 5 NY3d at 19). Generally, when parties, particularly sophisticated business entities, enter into an arm's-length business transaction, the terms of their contract govern their relationship (Northeast Gen. Corp. v. Wellington Adv., Inc., 82 NY2d 158, 160, 162-163 [1993] ["Courts look to the parties' agreements to discover, not generate, the nexus of [their] relationship"]).
Here, the Amended Complaint fails to sufficiently plead that a fiduciary relationship existed between either Swati or ACM and plaintiffs. As for ACM, plaintiffs allege in the Amended Complaint that ACM, as "managing member of [ACP]" owed its non-managing members a fiduciary duty (AC ¶ 174). But the ACP Operating Agreement clearly disclaimed away "any duty, fiduciary or otherwise [owed by ACM], to [ACP] or any Member other than their good faith performance of the administrative obligations" set forth in the ACP Agreement (Agreement § 3.4). Because plaintiffs fail to allege any administrative obligations that ACM purportedly failed to perform in good faith—and in fact, largely fail to allege any conduct attributable ACM in the Amended Complaint—their breach of fiduciary duty claim against it must necessarily be dismissed (see Crestview SPV, LLC v Crestview Fin., LLC, 217 AD3d 473, 473-474 [1st Dept 2023] [affirming dismissal of aiding and abetting breach of fiduciary duty claim where LLC agreement disclaimed any fiduciary duties owed to members and thus there was no fiduciary duty to aid and abet]; JP Morgan Chase Bank, N.A. v Controladora Comercial Mexicana S.A.B. De C.V., 29 Misc 3d 1227[A], at *11 [Sup Ct, NY County, 2010], citing CIBC Bank & Trust Co. (Cayman) Ltd. v Credit Lyonnais, 270 AD2d 138, 139 [1st Dept 2000] ["Accordingly, where the parties' agreement specifically disclaims a fiduciary relationship, no defense of, or claim for, breach of fiduciary duty will lie"]; AJW Partners, LLC v Cyberlux Corp., 21 Misc 3d 1109[A] at *3 [Sup Ct, NY County, Sept. 19, 2008] [dismissing breach of fiduciary duty counterclaim "in light of the plain contractual language disavowing a fiduciary relationship"]).
Turning to Swati, plaintiffs fail to offer any independent basis arising from the relationship between Swati and plaintiffs to conclude that Swati owed a fiduciary duty to them. Rather, the only basis offered by plaintiffs to contend that such a fiduciary duty exists is that Swati maintains a 50% interest in ACM (see AC ¶¶ 26, 175). But as explained above, any such fiduciary duties owed by ACM were disclaimed in the ACP Operating Agreement, and plaintiffs otherwise fail to identify any administrative functions that Swati, on behalf of ACM, failed to carry out in good faith. At any rate, plaintiffs have failed to cite to any authority suggesting that [*16]a controlling-interest holder of a managing member of an LLC owes a separate and distinct fiduciary duty to the non-managing members of that same LLC solely by virtue of its controlling interest in the managing member.
In sum, plaintiffs' breach of fiduciary duty claim against Swati and ACM is dismissed.
D. Unjust Enrichment
Finally, with regard to the unjust enrichment claim asserted against it, ACM contends that the Amended Complaint fails to state a claim because, among other things, plaintiffs have failed to allege any enrichment by ACM at plaintiffs' expense or that, in any event, equity and good conscience would require the return of any fees earned by ACM (ACM MOL at 17; ACM Reply at 5). To state a claim for unjust enrichment, a plaintiff must allege that: "(1) the defendant was enriched, (2) at plaintiff's expense, and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered" (see Schroeder v Pinterest Inc., 133 AD3d 12, 26 [1st Dept 2015] [alterations omitted]). Here, plaintiffs maintain that ACM was "enriched in the form of fees paid to them from the proceeds of" plaintiffs' investment (AC ¶ 171). However, given the general dearth of allegations related to ACM in the Amended Complaint, there is simply no basis to discern that ACM ever received any such fees so as to have been enriched, let alone was enriched against equity and good conscience. Accordingly, the court dismisses plaintiffs' unjust enrichment claim as asserted against ACM for failure to sufficiently plead an unjust enrichment claim.
CONCLUSION
For the foregoing reasons, it is hereby
ORDERED that defendants Bulltick Financial Advisory Services, LLC, Hector Villaescusa, Javier Martin Riva, and Adolfo del Cueto's motion to dismiss (MS004) is granted and the claims asserted against them are dismissed for lack of personal jurisdiction; and it is further
ORDERED that defendant Jamil Swati's motion to dismiss (MS005) is granted and the claims asserted against him are dismissed; and it is further
ORDERED that defendant Aithre Capital Management LLC's motion to dismiss (MS006) is granted and the claims asserted against it are dismissed; and it is further
ORDERED the Clerk of the Court shall enter judgment accordingly; and it is further
ORDERED that defendants are to serve a copy of this order together with a notice of entry upon plaintiff and the Clerk of the Court within 10 days of this order.
DATE 3/19/2025
MARGARET A. CHAN, J.S.C.

Footnotes

Footnote 1: The following
facts are drawn from the Amended Complaint, its exhibits, and the affirmations and exhibits submitted by the parties. These facts are accepted as true solely for purpose of this motion.

Footnote 2:Courts in this state have repeatedly recognized that "[i]n assessing the legal sufficiency of a claim, [a] [c]ourt may consider those facts alleged in the complaint, documents attached as an exhibit therefor or incorporated by reference . . . and documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference" (see Dragonetti Bros. Landscaping Nursery & Florist, Inc. v Verizon NY, Inc., 71 Misc 3d 1214[A], at *2 [Sup Ct, NY County, 2021], affd 208 AD3d 1125 [1st Dept 2022]; Lore v NY Racing Assn Inc., 12 Misc 3d 1159[A], at *2 [Sup Ct, Nassau County, 2006], citing Pisani v Westchester County Health Care Corp., 424 F Supp 2d 710, 714 [SD NY 2006]). Here, by explicitly referencing the ACP Operating Agreement in the Amended Complaint, plaintiffs have incorporated it by reference.

Footnote 3: Swati holds a 50% interest in ACM, while Domus holds the remaining 50% interest (see AC ¶ 26).

Footnote 4: As alleged, although Theia participated in the fraud, it is no longer an entity that can participate in a lawsuit or satisfy any judgment as a result of the receivership and its sale of all of Theia's assets (see AC ¶ 156).

Footnote 5: In all of the cases cited by the court for this proposition, the non-signatory entity had a substantial amount of control in the outcome of the relevant transaction or the affairs of the non-signatory (see e.g. Firefly Equities LLC v Ultimate Combustion Co., Inc., 736 F Supp 2d 797, 797-800 [SD NY 2010] [holding that company's president was "closely related" because he himself had signed the at-issue agreement]; Roby v Corp. of Lloyd's, 996 F2d 1353, 1360 [2d Cir 1993] [holding that "complaints against the individual Chairs are completely dependent on the complaints against the [principals]" and arose "out of the same misconduct charged against the [principals]). No such circumstances are present here.

Footnote 6: The court does not reach the Bulltick Defendants' alternative arguments that this case should be dismissed on the grounds of forum non conveniens or for failure to state a claim.

Footnote 7: In fact, in the case of the alleged "201204 Theia Investor Presentation," plaintiffs do not even identify what "substantial falsehoods" were contained in the presentation (see AC ¶ 88).

Footnote 8: To the extent that plaintiffs claim that their aiding and abetting claim is asserted against Swati based on his failure to disclose the looming default on the Brevet Notes, a failure to disclose details about an entity's insolvency, alone, "is insufficient to support a claim of aiding and abetting fraud absent a fiduciary duty or some other independent duty owed . . . to plaintiffs" (see Stanfield, 64 AD3d at 476 [holding that claim that defendant "assisted in the alleged fraud by failing to disclose Meridian's insolvency" failed to establish substantial assistance]).